UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

**UNITED STATES OF AMERICA**     \*
                                 \*
                                 \*
**v.**                           \*
                                 \*     **Criminal No. 23-cr-323-DKC**
                                 \*
**MICHAEL VERZALENO, JR., ET AL.,**  \*
                                 \*
**Defendants.**                  \*

## MOTION BY DEFENDANTS FOR A *FRANKS* HEARING AND SUPPRESSION OF EVIDENCE

## <u>**TABLE OF CONTENTS**</u>

Page

I.  PRELIMINARY STATEMENT.................................................................................1

II.  RELEVANT FACTS .........................................................................................3

    A.  KSC ...............................................................................................3

    B.  The C&A Internal Investigation and Referral........................................4

    C.  The Search Warrant Affidavit ...........................................................5

    D.  The Search ...................................................................................9

III.  ARGUMENT ..................................................................................................10

    A.  A *Franks* Hearing Is Required because the Special Agent Recklessly Omitted Exculpatory Information Material to the Magistrate Judge's Determination of Probable Cause..........................................................................10

    B.  The Government's Affidavit Lacked Probable Cause to Search KSC..................12

    C.  The Search Warrant Was Insufficiently Particular and Fatally Overbroad. ...........13

    D.  The "Fruits" of the Illegal Search of KSC Must Also Be Suppressed..................17

IV.  CONCLUSION................................................................................................17

Defendants Michael G. Verzaleno, Jr., Michael G. Verzaleno, Sr., and Susan P. Carrano (the "Defendants"), by and through their undersigned counsel and pursuant to Federal Rule of Criminal Procedure 12(b)(3), respectfully move this Court for a *Franks* hearing, and to suppress evidence and all fruits of that evidence seized in violation of the Fourth Amendment to the United States Constitution.

## I.      PRELIMINARY STATEMENT

The government either intentionally or recklessly omitted material information from the search warrant affidavit it submitted to the magistrate judge.

On September 15, 2021, the government executed a search warrant (the "Search Warrant") at Kearny Steel Container Corporation ("Kearny" or "KSC") in Newark, New Jersey. The FBI Special Agent ("Special Agent") alleged in his affidavit of probable cause that KSC had sent false invoices to one of its customers, Citrus & Allied Essences, Ltd. ("C&A"); that a corrupt C&A employee, Eugene DiNoto, authorized C&A to pay those invoices; and that KSC gave a portion of what it was paid to DiNoto in return. But there was one problem with the Special Agent's affidavit – his story was the opposite of what C&A had told the government.

In or about January 2020, C&A suspected that DiNoto was engaged in wrongdoing. So, C&A hired the international law firm Faegre Drinker Biddle & Reath LLP ("Faegre") to conduct an internal investigation. Faegre, in turn, hired the global consulting firm FTI Consulting ("FTI"). Several months of work followed. Faegre and FTI provided the government with a letter and PowerPoint presentation of their findings in May 2020. With respect to certain of C&A's packaging suppliers, Faegre/FTI concluded their invoices were "wholly unnecessary" and "appear to be fraudulent." By contrast, Faegre/FTI found that KSC's invoices "appear to be legitimate."

Sixteen months later, the government applied for a search warrant for KSC and two packaging companies unrelated to KSC, Tunnel Barrel & Drum Company ("TB&D") and Hartford

1

Fibre Drum, Inc. ("Hartford"). The government used a single affidavit of probable cause for all three companies, notwithstanding their differences. The affidavit mostly focused on TB&D and Hartford, two of the companies that Faegre/FTI had found engaged in fraud. It then accused KSC of the same fraud, but omitting Faegre/FTI's conclusion that KSC's invoices "appear to be legitimate." The government then alleged that KSC had engaged in Paycheck Protection Program ("PPP") fraud too, never disclosing that KSC's PPP loan had been forgiven, in full, six months before the Search Warrant application.

Now, with a complete record, it is clear what the government did. The government wanted to search KSC but did not have probable cause. To solve its problem, the government deliberately lumped a good company (KSC) with bad (TB&D and Hartford), spent most of its affidavit discussing TB&D and Hartford, omitted the favorable information to KSC, and hoped the magistrate judge would consider all three companies of the same piece. To further induce the magistrate into authorizing a search of KSC, the government injected the wholly unrelated notion of PPP fraud into the mix, no doubt believing that the magistrate would more easily look past the lack of probable cause if he thought KSC was a generally corrupt company. But the government's stratagem could only work if it omitted from the affidavit Faegre/FTI's conclusions with respect to KSC and also omitted that KSC's PPP loan was forgiven. So, that is what the Special Agent's affidavit did.

The government presented an intentionally (or at least recklessly) false search warrant application to the court. A *Franks* hearing is required. The Special Agent should be made to answer questions like: (1) why did the government accept Faegre/FTI's investigation and conclusions for TB&D and Hartford – effectively cutting and pasting Faegre/FTI's PowerPoint into the Special Agent's affidavit – but not for Kearny? (2) what investigation, if any, did the government conduct

2

between May 2020 and September 2021 with regard to Kearny that justified omitting Faegre/FTI's conclusion that KSC's transactions "appear to be legitimate?" (3) why did the government omit from its affidavit that KSC's PPP loan had been forgiven?

The Search Warrant did not only omit material information and lack probable cause, but it was also an impermissibly overbroad, non-particularized "general warrant." It authorized the seizure of every piece of physical and electronic paper at KSC, regardless of date, with the only limitations being that the paper be related to Kearny, Michael Verzaleno, Sr., or Michael Verzaleno, Jr. (no limitation, since that was all paper at KSC) and one of four broad criminal statutes, one of which the affidavit did not even allege KSC or the Verzalenos had committed. The search warrant returns prove these "limitations" were meaningless – agents took everything.

The Court should order a *Franks* hearing with respect to the omitted exculpatory information, and further suppress the evidence obtained, both directly and indirectly, from the government's unconstitutional search. *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

## II.   <u>RELEVANT FACTS</u>

### A.   **KSC**

KSC is a packaging company located in Newark, New Jersey. It has been owned and operated by the Verzaleno family for generations. KSC sells a variety of packaging materials, including drums and containers, to customers throughout the northeast. Its customers include Fortune 500 companies like General Electric and many fragrance companies like C&A. KSC also operates a reconditioning facility for packaging drums that is unique to New Jersey. The Verzalenos are responsible for more than 300 employees, and many of the people who are central to KSC's operations have spent decades with the company.

B.     **The C&A Internal Investigation and Referral**

The government's investigation began in May 2020, when counsel for C&A approached the FBI to report that one of its employees, Eugene DiNoto, had defrauded C&A. C&A had retained Faegre to investigate inconsistencies between the number of packaging drums it purchased and those it actually received. To analyze relevant records and invoices, C&A also retained FTI. Faegre's internal investigation, which formed the basis for the government's investigation, uncovered evidence of widespread fraud perpetrated by DiNoto on C&A. FTI's analysis revealed that from 2017 through 2019, DiNoto authorized payments from C&A to drum vendors for 1.1 million packaging drums, but in fact C&A never actually received 900,000 of them. (*See* Exhibit 1 at USA_01-110234.) Having discovered that C&A received only about 18% of the drums it purchased, Faegre and FTI reviewed internal company records related to C&A's drum vendors.

Faegre's investigation found that C&A's purchases from KSC and National Packaging Services, Inc. ("NPS"), both of which are owned by the Verzaleno family[1], were *legitimate*. Faegre reported to the FBI that the "majority of *legitimate* container purchases were likely made through NPS [and] Kearny." (Exhibit 2 at USA_05-116172 (emphasis added).)

By contrast, FTI found that C&A's purchases from other drum vendors, including TB&D, Hartford, American Pride Distributors, and P. Fernicola Inc. were likely fraudulent. Specifically, Faegre reported to the FBI that while purchases from KSC and NPS were substantiated by company emails, "the majority of the purchases made through Tunnel Barrel, as well as substantially all of the purchases made through the other known vendors (*e.g.*, Hartford, American

---

[1]     As noted previously, KSC is owned by Michael G. Verzaleno, Jr. and Michael G. Verzaleno, Sr.  NPS is owned by Michael G. Verzaleno, Jr.

Pride, and Fernicola) lack any email support and appear to be wholly unnecessary. Thus, they appear to be fraudulent." (*Id.* at USA_05-116172.)

In its presentation to the FBI, Faegre summarized one of its key findings as: "Purchases from certain vendors (NPS, Kearny) appear to be legitimate, but purchases from other vendors (Tunnel Barrel, Hartford, American Pride, Fernicola) appear to be substantially or totally fraudulent." (Exhibit 3 at USA_04-116112.)

### C.      The Search Warrant Affidavit

Although 16 months separated Faegre's presentation to the government and the Search Warrant, the government appears to have done little work of its own in the interim. The Search Warrant and affidavit in support mostly repeat the findings of Faegre and FTI but leave out their most important conclusion – C&A's purchases from Kearny "appear to be legitimate." That omission was deliberate. The government wanted to sweep KSC into a criminal conspiracy that Faegre had cleared KSC of, while relying on Faegre's proofs to do it. The entire Search Warrant and supporting affidavit were a skilled exercise in elision. The consequence was to hide from the magistrate judge information that would have been critical to the magistrate's decision to sign or decline to sign the Search Warrant. The government was obligated to provide the magistrate judge with the complete picture of what the government knew. The government failed to meet this basic obligation.

The government used the same probable cause affidavit to support its search of Kearny and two totally unrelated drum companies, TB&D and Hartford. Faegre's report had concluded that C&A's purchases from TB&D and Hartford were "wholly unnecessary" and "fraudulent." So, the government's affidavit began with them. Relying on the exact same information, analysis, and e-mails that Faegre had delivered to the government, the affidavit detailed a criminal conspiracy between TB&D, Hartford, DiNoto, and DiNoto's predecessor at C&A, Elliot Kleinman.

Specifically, the affidavit alleged that TB&D and Hartford delivered false invoices to C&A, DiNoto approved those invoices, and the proceeds from the false invoices were split 50-50 between the issuing drum company (TB&D or Hartford) and DiNoto and Kleinman (with DiNoto receiving 75% of the share and Kleinman receiving 25% of the share). In this way, according to the affidavit, C&A paid "millions of dollars for drums that it never received." (Exhibit 1 at ¶ 6.) The affidavit even provided a specific amount by which C&A was defrauded, namely $10.35 million. (*Id.*)

In support of its Search Warrant, the government provided to the court the same information Faegre had provided to it, but without crediting Faegre for the investigation. Faegre's investigation uncovered Sandpiper Enterprises, DiNoto's shell company that he deposited TB&D and Hartford checks into, (Exhibit 3 at USA_04-116096); EDK Management, Kleinman's shell company where he did the same, (*id.* at USA_04-116104); and evidence that TB&D regularly sent shipments to DiNoto via FedEx, (*id.* at USA_04-116106.) Faegre had highlighted for the government the same July 2018 e-mail from DiNoto to TB&D discussing how the fraud proceeds were to be apportioned that the government highlighted for the magistrate judge. (*Compare id.* at USA_04-116103 *with* Exhibit 1 at ¶ 13.) And Faegre had provided the government with the same loss estimate, approximately $10 million, that the government accepted and provided to the magistrate. (*Compare id.* at USA_04-116112 *with* Exhibit 1 at ¶ 6.)

The government's complete acceptance of Faegre's conclusions about TB&D and Hartford makes its complete rejection of Faegre's conclusions about KSC suspicious and deserving of this Court's scrutiny. It also calls into question the entire structure of the government's affidavit. The government chose to begin its affidavit with TB&D and Hartford – two companies for which there was overwhelming evidence of fraud. The government chose to impute that fraud to Kearny. And the government chose to do so by hiding Faegre's conclusions about Kearny from the magistrate

judge. Had the magistrate judge been told the full truth known to the government – that the source from which the government plagiarized its factual recitation had exonerated Kearny – the government's application would have been denied with respect to Kearny.

The government's probable cause to search KSC was scant – just five paragraphs. Those paragraphs did not allege that KSC issued checks to Sandpiper Enterprises or EDK Management. (*See* Exhibit 1 at ⁋ 23.) The government did not mention a single check, deposit, or e-mail purporting to show that KSC paid DiNoto or Kleinman. Moreover, the government did not cite any evidence that KSC paid DiNoto and Kleinman as part of a larger fraudulent kickback scheme. The government alleged only that KSC sent FedEx packages to DiNoto, and on four occasions, DiNoto made cash deposits "near in time" to the FedEx. (*Id.*) That is it.

Had the government disclosed that Faegre found that C&A's purchases from Kearny "appear to be legitimate," the Search Warrant would never have been signed with respect to Kearny. Had the government disclosed that Faegre had uncovered at least four other drum companies – one of which was owned by DiNoto's brother and a second operated by his wife – found or suspected to be engaged in the same fraud as TB&D and Hartford, the court would have challenged the government. (*See* Exhibit 3 at USA_04-116108-114.) How, for example, did the government know DiNoto's cash deposits were related to a FedEx from Kearny and not one of the four other drum companies? The government did not know (and does not know).

Indeed, a careful review of the probable cause affidavit *proves* that Faegre was right; KSC's shipments and invoices were "legitimate." According to the government, C&A overpaid its drum vendors by approximately $10.35 million between 2017-2019. (*See* Exhibit 1 at ⁋ 6.) That overpayment was made entirely to TB&D and Hartford. The affidavit alleges that C&A paid TB&D "approximately $9 million in reliance on DiNoto's approval of [TB&D's] invoices," (*id.* at

₱ 8), and Hartford "approximately $1.86 million in reliance on DiNoto's approval of [Hartford's] invoices." (*Id.* at ₱ 10.) All of the alleged $10.35 million overpayment was accounted for in what C&A paid to TB&D and Hartford; there was nothing left to overpay KSC.

Perhaps the government realized this. Certainly the government knew about Faegre's conclusion with respect to Kearny. So, in an attempt to create probable cause where there was none, the government injected a completely unrelated "crime" into the affidavit: PPP fraud. The affidavit alleges that KSC misused approximately $900,000 in PPP funds. There was no PPP fraud (as the government well knows, since there is no mention of PPP fraud in the indictment). KSC's PPP application was approved by its longtime accountant, Roy Levine. As Mr. Levine details in his declaration, KSC applied for a PPP loan under his direction; used the loan on allowed expenses; applied for PPP forgiveness under his direction; and had its loan forgiven in March 2021 – six months before the Search Warrant was executed. (*See* Declaration of Roy Levine at ₱₱ 4, 6-8.) As Mr. Levine explains, and the government knew, KSC's PPP loan was income to KSC, and nothing prevented it from using PPP funds or existing funds to "operate its business while also making distributions to its principals." (*Id.* ₱ 10(d).) The SBA agreed and forgave KSC's loan in full. The Search Warrant and affidavit omitted that crucial fact.

But the Search Warrant and affidavit in support were not only deliberately misleading, they were also unconstitutionally overbroad. The Search Warrant authorized agents to search KSC for "all records and information" without any date restriction even though the affidavit alleged the fraud mostly took place between 2017-2019 and by necessity ended in January 2020 when C&A limited DiNoto's authority. (*See* Exhibit 1 at ₱ 5.) The Search Warrant was also unrestricted by topic. It allowed agents to seize "all records and information … related to the following entities and individuals … Kearny Steel Container Corporation … Michael Verzaleno, Sr., and Michael

8

Verzaleno, Jr." A plain reading of the Search Warrant authorized agents to seize every scrap of paper at KSC. The only limitation, and it was not a real one, was that the scrap of paper be "related to" one of four of the broadest criminal statutes – one of which, tax evasion, was not even alleged against Kearny or the Verzalenos in the affidavit. The Search Warrant did not end there. It also authorized agents to seize all of KSC's "[c]omputers, computer hardware, cellular telephones, [and] software," again with the only limitation being that they relate to the specified criminal offenses.

Read as a whole, agents were permitted to seize every piece of physical paper or byte of digital information at Kearny, regardless of date, as long as it related to conspiracy to commit mail or wire fraud, money laundering, bank fraud, or tax evasion, the last of which, again, the affidavit did not even allege occurred by Kearny or the Verzalenos.  The Search Warrant was impermissibly overbroad.

### D.    The Search

On September 15, 2021, at about 7 a.m., 26 federal agents arrived at KSC to execute the Search Warrant. (Exhibit 4 at USA_01-110399-400.) The agents spent six hours searching thirteen rooms at KSC and seized voluminous materials including invoices, correspondence, checks, notepads, financial record books, tax records, financial statements, accounting records, credit card photocopies, several cellphones, and more. (*See* Exhibit 5.) The FBI seized numerous pages of documents from the contents of at least eight filing cabinets, numerous drawers, and folders. (*Id.*)

While the search of KSC was ongoing, federal agents requested access to another KSC property for which they did not have a search warrant, 425 South Street, Newark, New Jersey. (Exhibit 6 at USA_01-110460.) Michael Verzaleno, Jr. acquiesced to this request, which resulted in the seizure of computers and other items at that location. (Exhibit 7 at USA_01-110462.)

III.   **ARGUMENT**

    A.   **A *Franks* Hearing Is Required because the Special Agent Recklessly Omitted Exculpatory Information Material to the Magistrate Judge's Determination of Probable Cause.**

This case began with a referral by C&A to the FBI in which C&A, after an exhaustive investigation by two international firms, concluded that KSC's sales to it were "legitimate." The Special Agent omitted this critical exculpatory information from his affidavit. Had it been included, it would have unquestionably defeated a determination of probable cause. The Special Agent's omission was reckless (at minimum) because it directly contradicted information contained in the affidavit. Therefore, a *Franks* hearing is warranted.[2]

A defendant can establish a *Franks* violation by proving that "the affiant intentionally or recklessly omitted material information from the affidavit." *United States v. Wharton*, 840 F.3d 163, 168 (4th Cir. 2016). To obtain suppression based on an omission, a defendant must first show that the affiant omitted facts from the application "with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading." *United States v. Tate*, 524 F.3d 449, 455 (4th Cir. 2008). An affiant recklessly omits a fact where "[a]ny reasonable person would have known that this was the kind of thing that the judge would wish to know." *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993); *see also Burke v. Town of Walpole*, 405 F.3d 66, 81-82 (1st Cir. 2005) (recklessness inferred where the omitted information consisted of "facts that any reasonable person would know that a judge would want to know when deciding whether to issue a warrant").

Here, it is beyond question that any reasonable person would know that the magistrate judge would have wanted to know that C&A, the victim of the purported crime, had conducted an

---

[2]   Only a *Franks* hearing would permit the Court to assess the FBI's motivation for the inexplicable omission of obviously exculpatory information.

investigation and concluded that KSC had not victimized it. Specifically, the Special Agent withheld from the magistrate judge that Faegre/FTI had conducted an extensive records analysis and had concluded the "majority of *legitimate* container purchases were likely made through NPS [and] Kearny." (Exhibit 2 at USA_05-116172 (emphasis added).) The Special Agent withheld from the magistrate judge Faegre's key finding that it had presented to the FBI – "[p]urchases from certain vendors (NPS, Kearny) appear to be legitimate, but purchases from other vendors (Tunnel Barrel, Hartford, American Pride, Fernicola) appear to be substantially or totally fraudulent." (Exhibit 3 at USA_04-116112.) It is undisputed that Faegre's exculpatory information was presented to the FBI, yet, inexplicably, none of it was included in the Special Agent's affidavit.

Information from the purported victim that the subject of the warrant is in fact innocent of the allegations, and not involved in the alleged scheme, is surely the "kind of thing that the judge would wish to know." *Jacobs*, 986 F.2d at 1235; *Burke*, 405 F.3d at 82. The omission of such plainly exculpatory evidence constitutes, at minimum, reckless disregard of whether the omission would make the affidavit misleading under *Franks*. A victim's statement is generally so central to a warrant application and the finding of probable cause that reviewing courts do not find themselves in the position of analyzing an attesting officer's failure to include the victim's statement. *Cf. United States v. Beckham*, 325 F. Supp. 2d 678, 687 (E.D. Va. 2004) (highlighting importance of statement from "putative victim" to the probable cause analysis). Stated differently, attesting officers know that a victim's statement is the "kind of thing that the judge would wish to know," and thus attesting officers always include that information to bolster their applications. *Jacobs*, 986 F.2d at 1235. The importance of a victim's statement does not change when the victim provides exculpatory, rather than inculpatory, information regarding the target of the search warrant.

The omitted material here, if included, would defeat a finding of probable cause. As noted above, over 75% of the probable cause section of the affidavit focused on TB&D and Hartford, while the facts describing KSC's involvement in this alleged kickback scheme were scant at best – a mere five paragraphs over two and half pages. *See* page 7, *supra.* With probable cause to search KSC already lacking, the addition of the clearly exculpatory evidence from Faegre's investigation would have "changed the probable cause calculus" and "would [have] defeat[ed] probable cause." *United States v. Somerlock*, 602 F. Supp. 3d 791, 801 (D. Md. 2022). Because the omitted facts from the Faegre internal investigation certainly made the affidavit deceptive and misleading, a *Franks* hearing is required, and the warrant should be suppressed. *Tate*, 524 F.3d at 454-55 (4th Cir. 2008).

**B.     The Government's Affidavit Lacked Probable Cause to Search KSC.**

Putting aside the plainly exculpatory missing evidence, the little evidence included in the Special Agent's affidavit regarding KSC's involvement in the kickback scheme fell well short of establishing probable cause to search KSC's office and warehouse. The Fourth Amendment's guard against "unreasonable searches and seizures" mandates that a warrant be issued only if, "given all the circumstances set forth in the affidavit," the magistrate finds "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). The reviewing court must ensure that there was a "substantial basis for concluding" that probable cause existed. *Id.* at 238-39. The magistrate's determination must rest on "[s]ufficient information" and "cannot be a mere ratification of the bare conclusions of others." *Id.* at 239. Further, "[w]hen a defendant challenges a search warrant, the government bears the burden of proof by a preponderance of the evidence at a suppression hearing." *United States v. Aksu*, 2013 WL 1898151, at *2 (D. Md. May 3, 2013).

The affidavit does not provide a "substantial basis for concluding" that KSC was involved in an illegal kickback scheme.  Instead, the Special Agent's affidavit overwhelmingly focuses on the actions of two other companies – TB&D and Hartford – that are completely unrelated to KSC. The vast majority of the Special Agent's affidavit details a kickback scheme between the owner of TB&D and Hartford and DiNoto and relies on the taint of these other parties' actions to impute criminality to KSC. The affidavit, however, fails to connect KSC with TB&D and Hartford in a conspiracy or even a common scheme. Such a scheme was not alleged in the affidavit, and has not been charged in the Indictment. The Special Agent admitted in his affidavit that there was not "a pattern of check deposits following the receipt of FedEx packages from KSC, as happened with TB&D and Hartford." (*See* Exhibit 1 at ⁋ 23.) Thus, any allegations of kickbacks from TB&D and Hartford were completely irrelevant to a finding of probable cause regarding KSC. Put simply, there is no basis for the government to have included this evidence in the affidavit. Together with the government's omission of patently exculpatory information and inclusion of irrelevant (and flat wrong) information about PPP fraud, it certainly appears that the government sought to deliberately mislead the court. Taking the limited evidence involving KSC on its own terms, as the Court must, the Special Agent's affidavit establishes nothing more than an ordinary business relationship between KSC and C&A. Accordingly, there was no probable cause to search KSC.

### C.     The Search Warrant Was Insufficiently Particular and Fatally Overbroad.

The Search Warrant suffers from a final defect: it lacks the specificity required by the Fourth Amendment, which demands that a warrant must "particularly describe[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This requirement protects against "a general, exploratory rummaging in a person's belongings" *United States v. Uzenski*, 434 F.3d 690, 706 (4th Cir. 2006) and originated from the Framers' opposition to "indiscriminate searches and seizures conducted under the authority of 'general warrants'" known as writs of

assistance. *Payton v. New York*, 445 U.S. 573, 583 (1980). The specificity requirement "also ensures that the magistrate issuing the warrant is fully apprised of the scope of the search and can thus accurately determine whether the entire search is supported by probable cause." *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986).

Both in its generality and its breadth, the Search Warrant here failed to satisfy the Fourth Amendment. By its plain terms, federal agents had the authority to seize practically any item related to KSC, Michael Verzaleno, Sr., or Michael Verzaleno, Jr. – without any temporal limitation.[3] The Search Warrant authorized the seizure of "[a]ll records and information related to violations" of four broad criminal statutes (one of which did not even apply to KSC) and permitted the seizure of seemingly any item, regardless of when that item was created, related to fifteen entities and individuals including KSC, Michael Verzaleno, Sr., and Michael Verzaleno, Jr. Further, the Search Warrant authorized the seizure of every computer, server, cell phone, tablet, software, or other electronic device at KSC.

Although the warrant purports to identify specific items, the list is so exhaustive that it names every conceivable item that might be found. Such an expansive list is akin to a warrant directing agents to seize all evidence that could possibly be related to "wire fraud, fraud, conspiracy, or tax evasion" generally and does not restrict the agent's discretion at all. *United*

---

[3]     Courts have repeatedly pointed to the absence of a temporal limitation as an indicator of a warrant's unconstitutional overbreadth. *See, e.g., United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017) (noting that a warrant was unnecessarily broad in part because it "should have requested data only from the period of time during which [defendant] was suspected of taking part in the prostitution conspiracy"); *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 84 (2d Cir. 2016) (finding warrant defective in part because it did not "place any temporal limit on the property to be seized"); *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995) (finding one factor in the specificity analysis to be the government's failure to "limit the scope of the seizure to a time frame within which the suspected criminal activity took place, even though [the] affidavit indicates that the alleged criminal activity began relatively late in [the business's] existence").

*States v. Dickerson*, 166 F.3d 667, 694 (4th Cir. 1999) *rev'd on other grounds*, 530 U.S. 428, 120 (2000) (noting that a warrant authorizing a search for evidence relating to a broad criminal statute or general criminal activity such as wire fraud, fraud, conspiracy, or tax evasion, is overbroad because it provides no readily ascertainable guidelines for the executing officers as to what items to seize) (internal citations and quotations omitted). Fraud and tax evasion do not "tend[] to generate quite distinctive evidence" that the Fourth Circuit has noted exists when a search warrant relies on otherwise broad criminal statutes. *Id.* at 693-94 (agreeing that bank robbery, while broad, leads to "distinctive evidence" such as "guns, masks, bait money, dye-stained bills and clothes, carrying bags"). *United States v. Shah*, 2015 WL 72118, at *13–14 (E.D.N.C. Jan. 6, 2015) (holding that warrant seeking to seize evidence derived from the Computer Fraud and Abuse Act was insufficiently particular because the crime "would not necessarily generate such 'distinctive evidence' as bank robbery or narcotics). Indeed, without any particularity limitation, the warrant may just as well have told agents to search for and seize any evidence related to Michael Verzaleno, Jr. or Sr. that could touch upon the purported offenses and be found in KSC's offices.

Numerous courts have found such exhaustive warrants, like the Search Warrant, to be overbroad. For example, in *United States v. Bridges*, the Ninth Circuit found that although the search warrant's accompanying affidavit was detailed, the list of items to be seized was impermissibly expansive in that it authorized almost all of the defendant's property, papers, and office equipment to be seized. The court explained: "The list is a comprehensive laundry list of sundry goods and inventory that one would readily expect to discover in any small or medium-sized business in the United States. In fact, other than Attachment B and the warrant's description of the location of [the target corporation's] offices, the warrant delineates no clear material limitation or boundary as to its scope." 344 F.3d 1010, 1017 (9th Cir. 2003); *see also United States*

*v. Wey*, 256 F. Supp. 3d 355, 385 (S.D.N.Y. 2017) (warrant was insufficiently particular where it "set[] forth expansive categories of often generic items subject to seizure—several of a 'catch-all' variety—without, crucially, any linkage to the suspected criminal activity, or indeed any meaningful content-based parameter or other limiting principle").[4]

Here, as in *Bridges* and *Wey,* a search warrant for "any and all" financial records, communications, tax documents, computers, cellphones and computer hardware of a corporation and its owners is exceptionally and impermissibly broad.[5] KSC does business with dozens of companies – both customers and suppliers, producing millions of pages of business records, communications, and documents. Yet the warrant authorizes the seizure of every form of document or item imaginable that would be maintained by a business, all without temporal limitation. The warrant authorizes the seizure of every computer, server, cell phone, tablet, and other electronic device, both large and small, within the company's headquarters.  It even authorizes all United States currency present in the business.  Nothing in the affidavit justifies so broad a warrant, and the failure to limit the search in any meaningful way is a clear indication of its overbreadth.

Proof of the warrant's unconstitutional overbreadth is found in the documents the 26 FBI agents seized. Records were seized without any regard to an identifiable time limit. Invoices dating back to 2013 were seized. Nine years of tax records and financial statements, as far back as 2012,

---

[4]     *See also United States v. Vilar*, 2007 WL 1075041, at *23 (S.D.N.Y. Apr. 4, 2007), at *22–23 (warrant provision authorizing seizure of all "corporate records" concerning the occupant of the premises and its affiliates reflected "patent lack of particularity," "compounded by the absence of any date restriction on the items to be seized" notwithstanding inclusion of illustrative list of items).

[5]     Indeed, in discussing the types of computer hardware and certain records to be seized, the Search Warrant includes the language "including but not limited to." As the Ninth Circuit noted in *Bridges,* if "the scope of the warrant is 'not limited to' the specific records listed on the warrant, it is unclear what is its precise scope or what exactly it is that the agents are expected to be looking for during the search." *Bridges*, 344 F.3d 1010, 1018 (9th Cir. 2003).

were seized notwithstanding that the affidavit does not allege tax evasion. The executing agents also seized business records from NPS, such as invoices, deposits, accounting records, and financial statements, despite NPS being outside the scope of the warrant and not even mentioned in the Special Agent's affidavit. The seizure of these documents demonstrates the Search Warrant and its execution had no identifiable boundaries, whether in terms of timeframe or responsiveness to the allegations made in the affidavit of probable cause.

### D.      The "Fruits" of the Illegal Search of KSC Must Also Be Suppressed.

Given the search of KSC was unconstitutional, for the reasons outlined above, the "fruits" of that search must also be suppressed. It has long been established that the exclusionary rule "extends as well to the indirect as the direct products of such invasions" from unlawful searches. *Wong Sun*, 371 U.S. at 484. Accordingly, evidence derivatively obtained from an unconstitutional search must also be suppressed.

## IV.   <u>CONCLUSION</u>

On September 15, 2021, the FBI conducted an unconstitutional search of KSC's headquarters at 401 South Street, Newark New Jersey. The illegality of the search began with the Special Agent's affidavit, which omitted obviously exculpatory information from Faegre's internal investigation that would have been clearly material to the magistrate judge's determination and defeated probable cause. It also included false information about PPP fraud to bolster probable cause where none existed. Accordingly, the defendants request that this Court hold a *Franks* hearing.

Further, even without including the exculpatory information the government omitted, there was insufficient probable cause to search KSC. The cursory allegations about KSC demonstrated little more than an ordinary business relationship, and the Special Agent's affidavit improperly relied on the actions of unrelated parties to justify probable cause.

17

Lastly, the Search Warrant was insufficiently particular and overbroad. Accordingly, the search of KSC was unconstitutional, and therefore evidence seized from it, and the fruits of that evidence, must also be suppressed.

Dated: April 30, 2024

/s/ George P. Varghese
George P. Varghese
Benjamin Conery
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
George.Varghese@wilmerhale.com (*pro hac vice*)
Benjamin.Conery@wilmerhale.com (*pro hac vice*)

Lee Vartan
Melissa Wernick
CHIESA SHAHINIAN & GIANTOMASI PC
105 Eisenhower Parkway
Roseland, NJ 07068
(973) 325-1500
lvartan@csglaw.com (*pro hac vice*)
mwernick@csglaw.com (*pro hac vice*)
*Counsel for Defendant Michael G. Verzaleno, Jr.*

/s/ Zach Intrater
Zach Intrater
AGNIFILO INTRATER LLP
445 Park Avenue, 7th Floor
New York, NY 10022
(917) 721-7331
zach@agilawgroup.com (*pro hac vice*)
*Counsel for Defendant Michael Verzaleno, Sr.*

/s/ David M. Eskew
David M. Eskew
ABELL ESKEW LANDAU LLP
256 Fifth Avenue, 5th Floor
New York, NY 10001
(646) 970-7340
deskew@aellaw.com

(*pro hac vice*)
*Counsel for Defendant Susan P. Carrano*

**CERTIFICATE OF SERVICE**

I certify that, on April 30, 2024, this document was electronically filed with the Clerk of Court using the Court's CM/ECF system, which will then serve a notification of the filing to the registered parties of record.

*/s/* George P. Varghese_____
George P. Varghese