

**JARROD L. SCHAEFFER**
646-970-7339 (direct dial)
jschaeffer@aellaw.com
aellaw.com

256 Fifth Avenue, 5th Floor
New York, New York 10001

May 10, 2024

**By ECF**

Honorable Deborah K. Chasanow
United States District Judge
District of Maryland
6500 Cherrywood Lane, Ste 400
Greenbelt, Maryland 20770

   Re: *United States v. Michael George Verzaleno Jr., et al.*,
     **Docket No. 23-cr-323-DKC**

Your Honor:

   We represent Susan P. Carrano in the above-referenced matter and respectfully submit this supplemental letter on behalf of all defendants (together, the "Defendants") pursuant to the Court's Order dated May 8, 2024. (Dkt. 72.) For the following reasons, Defendants request that the Court order immediate production of the undisclosed information discussed herein pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); and Rule 5(f) of the Federal Rules of Criminal Procedure.

**RELEVANT FACTS**

   ***a. The Indictment***

   According to the indictment, from in or about September 2013 through in or about January 2020, Defendants conspired among themselves and with two uncharged individuals, Eugene DiNoto—an employee of one of the Companies—and John Criscuolo, to defraud two companies (the "Companies") by submitting "false purchase invoices for drums that fraudulently overstated the amount of money the Companies owed Kearney [*sic*] Steel Container Corporation . . . ." (Dkt. 1 ("Indictment") at 3 ¶ 10.) In return for DiNoto's "approval and submission of those false invoices for payment" to the Companies, Defendants allegedly paid DiNoto and Criscuolo "a share of the inflated invoice amounts in the form of cash kickbacks." (*Id.* (defining this conduct as the supposed "scheme to defraud").)

   First, the Indictment charges Defendants with conspiring to engage in the alleged scheme to defraud. (*See id.* at 4–5 ¶¶ 11–20.) Second, it charges Defendants with fourteen counts of wire fraud based on that scheme. (*See id.* at 6–7 ¶¶ 1–2.) Here, the Indictment includes only two sparse paragraphs and a single chart with high-level descriptions of emails allegedly exchanged between certain email accounts. (*Id.* at 7 ¶ 2.) Third, the Indictment charges Defendants with three counts of mail fraud based on the purported scheme. (*See id.* at 8 ¶¶ 1–2.) Again, it includes only two

paragraphs and a chart with high-level descriptions of three packages allegedly sent via FedEx. (*Id.*)  Fourth, the Indictment charges Ms. Carrano with making allegedly false statements to federal law enforcement during a voluntary interview at the U.S. Attorney's Office in Baltimore.  (*See id.* at 9–10 ¶¶ 1–2.)

### b.  Overview of Related Events

Long before this Indictment was filed, Peter W. Baldwin, an attorney at Faegre Drinker Biddle & Reath LLP ("Faegre"), which was then serving as counsel to Citrus and Allied Essences, Ltd. ("C&A"), one of the Companies,[1] sent a letter to the Federal Bureau of Investigation ("FBI") on May 18, 2020.  (*See* Ex. A (the "Faegre Letter").)  As explained by Mr. Baldwin, the purpose of that letter was to "provide[] some background" on an internal investigation conducted by Faegre and FTI Consulting ("FTI") on behalf of C&A, "[i]n advance of [a] WebEx meeting" the following day "to discuss the criminal referral involving a multi-million dollar fraud perpetrated against our client."  (Ex. B at 2.)  Notably, C&A's internal investigation concluded that a number of other companies had defrauded C&A, but that most *legitimate* container purchases made by C&A were with KSC and another company owned by Michael Verzaleno, Jr., called National Packaging Services, Inc. ("NPS").  (*See* Ex. A at 4.)

The next day, May 19, 2020, Mr. Baldwin and his associates met with various FBI personnel, including a Supervisory Special Agent, a Special Agent, an Intelligence Analyst, a Staff Operations Specialist, a Supervisory Forensic Accountant, and a Forensic Accountant.  (*See* Ex. C.)  Notes of that meeting reflect that Mr. Baldwin gave a presentation to the FBI regarding C&A's internal investigation, which included a PowerPoint that expanded on matters addressed in the Faegre Letter (the "Faegre PPT").  (*See* Ex. D.)  Those notes do not reflect any indication that Faegre accused KSC or NPS of fraud.  To the contrary, they are silent as to KSC and reflect that "NPS was the only company FTI and Faegre . . . identified as having provided bills of lading for container purchases."  (Ex. C at 3.)  The Faegre PPT, which was subsequently provided to the Government, also does not claim fraud by KSC or NPS.  (*See* Ex. D.)  Rather, it reiterates the conclusion that "[a]lignment of container purchase invoices supported by email, along with overall usage estimates, indicates that the majority of 'legitimate' container purchases were made through NPS, K[SC], and, to a much lesser degree, Tunnel Barrel," though "the vast majority of the purchases from Tunnel Barrel . . . lack[ed] any email support."  (*Id.* at 10.)

Approximately one year after Faegre met with the FBI, NPS filed a federal lawsuit against C&A and TEI that alleged, among other things, claims for unpaid invoices from 2020 totaling more than $350,000.  *See Nat'l Packaging Servs., Inc. v. Citrus & Allied Essences Ltd., et al.*, 21 Civ. 6366 (KM) (JBC), Dkt. 1 (D.N.J. Mar. 23, 2021).[2]  In response, the Companies sought to join

---

[1]    Discovery in this case makes clear that Company A and Company B are actually C&A and its affiliated company, Trilogy Essential Ingredients, Inc. ("TEI"), respectively.  The Government has confirmed that C&A is Company A.  (*See* Dkt. 43 at 2.)  There are no allegations specific to Company B.

[2]    For purposes of this motion, the Court may take judicial notice of the existence of other litigation.  *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (observing that courts may "properly take judicial notice of matters of public record"); *United States v.*

KSC as a counter-defendant and asserted counterclaims mirroring the factual allegations in the Indictment.[3]  *See id.*, Dkt. 9 (D.N.J. June 18, 2021) (alleging, *inter alia*, that "[i]n early 2020, C&A conducted an internal audit, which revealed inconsistencies and abnormalities associated with the purchase of drums and packaging containers used in the storage and shipment of C&A's products," and "further revealed that [KSC and NPS] conspired with at least one former C&A employee . . . to induce C&A to pay false and/or fraudulently inflated invoices for drums and containers").  The court granted the joinder request.  *See id.*, Dkt. 33 (D.N.J. Oct. 18, 2021).  About seven months later, however, the parties voluntarily dismissed all claims with prejudice.  *See id.*, Dkt. 48 (D.N.J. May 4, 2022).

On September 14, 2023, approximately sixteen months after the dismissal of those claims and more than three years after Faegre's meeting with the FBI, Defendants were charged with offenses purportedly stemming from a scheme to defraud C&A.  (*See generally* Dkt. 1.)  The alleged conspiracy echoes the subject matter of C&A's internal investigation and overlaps substantially with the claims dismissed in civil litigation between C&A, NPS, and KSC.  The substantive wire and mail fraud charges forming the balance of the Indictment against Defendants are equally reminiscent, since they are based on actions purportedly undertaken "for the purpose of executing and attempting to execute the scheme to defraud."  (Dkt. 1 at 6 ¶¶ 1–2, 8 ¶¶ 1–2.)

### c.  *Pertinent Discovery Developments*

On October 11, 2023, the Court entered orders pursuant to Rule 5(f) and the Due Process Protections Act, Pub. Law 116-182, 134 Stat. 894 (Oct. 21, 2020), directing the Government, *inter alia*, "to adhere to the disclosure obligations set forth in *Brady* . . . and its progeny," and "to produce in a timely manner all exculpatory evidence to the defendant pursuant to *Brady* . . . and its progeny." (*See* Dkts. 24, 25, 28.)  On October 26, 2023, the Government reported to the Court that it had completed its production of Rule 16 discovery and would provide *Jencks* material closer to the trial date.  (Dkt. 39.)  The Government has not provided a date for a *Jencks* production.

On November 3, 2023, Defendants requested that the Government provide, among other things, "all *Brady* material that is within the possession, custody, or control of the government, the existence of which is known by the government, or the existence of which may become known to the government through the exercise of due diligence," including "evidence of any kind that tends to exculpate any of the [D]efendants, tends to be favorable or useful or material to the defense, or tends to affect the weight or credibility of the evidence to be presented against any of the [D]efendants," along with "the names, addresses, and any statements of any persons who were interviewed who did not supply incriminating information with respect to any of the [D]efendants."  (Ex. E at 1.)  Defendants also specifically requested production of "any and all presentations, work product, and communications between the government and Faegre [] or [C&A] . . . , as such work was specifically mentioned and relied upon in the government's search

---

*Johnson*, 215 F. Supp. 300, 315 (D. Md. 1963) (noting, in connection with a motion to dismiss charges in an indictment, that the court could take judicial notice of certain undisputed public facts, including that a defendant had not entered an appearance as an attorney in other litigation).  Defendants do not ask the Court to assume the validity of any facts disputed in that litigation.

[3]      Faegre represented the Companies and their counsel included Mr. Baldwin, the same attorney who provided information to the FBI that did not implicate KSC or NPS.

warrant applications," as well as "all interview reports with any [C&A] owners or employees." (*Id.* at 1–2.)

On November 22, 2023, the Government responded by saying that, "[i]n the interest of expediency," it "w[ould] be providing some of the information . . . requested" even though it believed that it "[wa]s under no obligation to do so under Rule 16 or the local rules," and further claimed that "much of [the requested information] is clearly *Jencks'* material that will be provided at a future date." (Ex. F at 1.) The Government provided some "additional Faegre [] records . . . created for [C&A]," but stated it "w[ould] not be providing reports of employee/witness statements at this time." (*Id.*) Among other things, the Government also refused to provide "FBI 302s and other memorandum [*sic*] of witness interviews, including DiNoto and Criscuolo," and "[m]aterial related to the search of Kleinman's residence."[4] (*Id.* at 1–2.) Finally, the Government said it "[wa]s aware of its disclosure obligations under *Brady* and w[ould] provide exculpatory evidence consistent with the holding in that case and its progeny." (*Id.* at 1.) No timeline was given.

Thereafter, the parties had an extended back-and-forth about the Government's productions. On February 14, 2024, for instance, Defendants informed the Government that it appeared certain Faegre materials and communications with the Government had not been provided. Two days later, on February 16, 2024, the Government responded that it believed the requested material should have been part of a large prior disclosure but was still confirming whether that was correct. In the interim, the Government agreed to provide copies of the requested material and stated that it would continue searching for responsive documents. On February 17, 2024, Defendants informed the Government that the material provided was missing multiple substantive attachments.

On March 7, 2024, the Government told Defendants that it had determined "[an] Excel spreadsheet was provided by Faegre as a reference document . . . created during their independent investigation prior to the FBI's involvement," which "[p]resumably, Faegre gave . . . to the FBI at one of the initial meetings to show the extent of their investigation on behalf of C&A." (Ex. G at 1.) The Government insisted, however, that Faegre "did not provide . . . copies of the documents/exhibits referenced on the spreadsheet, and the FBI did not request them." (*Id.*) Instead, the Government insisted, "[o]nce Faegre and C&A met with the FBI to explain their independent investigation into DiNoto's embezzling scheme," the FBI purportedly "had to start from scratch with their own investigation" and "issued a subpoena to C&A and then a search warrant to make sure the FBI had all of the original DiNoto documents," and "[a]s a result, some of the documents referenced on the Excel spreadsheet ended up in the possession of the FBI." (*Id.*)

On March 21, 2024, Defendants again wrote to the Government concerning material related to Faegre and the C&A internal investigation, noting that "in email correspondence produced between the FBI and Faegre . . . , it appears that on June 18, 2020, FTI [] sent the government materials presented by Faegre." (Ex. H at 1–2.) Defendants asked the Government to "confirm whether the referenced materials ha[d] been produced and, if so, where they can be found in the discovery." (*Id.* at 2.) The Government responded on March 29, 2024, again claiming that it "d[id] not have copies of the documents referenced in that [Faegre] spreadsheet," but disclosing that "during the recent additional search for Faegre documents per your request, a one-

---

[4]     Elliott Kleinman was DiNoto's predecessor at C&A.

page spreadsheet titled 'C&A Container Purchases by Vendor' was discovered" that had been "sent directly to the FBI by FTI [], not Faegre, which is why it was not captured in the original search."[5] (Ex. I at 1–2.) On April 8, 2024, the Government represented that "no other documents were sent directly by FTI to the government." (Ex. J at 1.)

As of this date, the Government has yet to produce material that it originally withheld (including FBI 302s and reports of witness interviews), any underlying documents considered by FTI and reflected in the internal investigation documents provided by Faegre, and anything else the Government has deemed to be *Jencks* material.

## APPLICABLE LAW

The Government has an undisputed obligation to promptly disclose any evidence or impeachment information that is favorable to a defendant and material to either guilt or punishment. *See, e.g.*, *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."); *Giglio v. United States*, 405 U.S. 150, 153–54 (1972) (explaining that material impeachment information is encompassed within the *Brady* rule); *accord Kyles v. Whitley*, 514 U.S. 419, 438 (1995) ("[The prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable."); *United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015) (applying these principles to vacate convictions). *Brady* "exists to preserve the fairness of a trial verdict and to minimize the chance that an innocent person would be found guilty," *United States v. Moussaoui*, 591 F.3d 263, 285 (4th Cir. 2010), *as amended* (Feb. 9, 2010), and it reaffirms that the Government's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).

Prosecutors have a duty "to learn of any favorable evidence known to the others acting on the government's behalf in the case," including all participants in the investigation. *Kyles*, 514 U.S. at 437; *United States v. Robinson*, 627 F.3d 941, 951 (4th Cir. 2010) ("*Brady*'s commands do not stop at the prosecutor's door; the knowledge of some of those who are part of the investigative team is imputed to prosecutors regardless of prosecutors' actual awareness."); *Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003) (noting that "the prosecutor's duty encompasses both impeachment material and exculpatory evidence, and it includes material that is 'known only to [] investigators and not to the prosecutor'"). The Government must meet these obligations even absent a request from the defense. *See, e.g.*, *United States v. Agurs*, 427 U.S. 97, 110 (1976) (explaining that "[i]f evidence highly probative of innocence is in his file, [the prosecutor] should be presumed to recognize its significance even if he has actually overlooked it"); *United States v. Johnson*, 996 F.3d 200, 206 (4th Cir. 2021) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)) ("Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt.").

Any "suppression of material exculpatory evidence violates the right to due process, 'irrespective of the good faith or bad faith of the prosecution.'" *Johnson*, 996 F.3d at 206 (citing

---

[5] It is unclear to Defendants why a search for Rule 16 information would include material from Faegre but not FTI, which was retained by Faegre on behalf of C&A.

*Brady*, 373 U.S. at 87). To ensure compliance with *Brady*, the Federal Rules of Criminal Procedure were amended to provide that "[i]n all criminal proceedings," a court "shall issue an oral and written order to prosecution and defense counsel that confirms the disclosure obligation of the prosecutor under *Brady* . . . and its progeny, and the possible consequences of violating such order under applicable law," at the first scheduled appearance with the parties. Fed. R. Crim. P. 5(f). The Court issued such orders in this case. (*See* Dkts. 24, 25, 28.)

When considering whether *Brady* has been satisfied, courts ask whether undisclosed evidence is: (1) favorable to a defendant because it is either exculpatory or impeaching; (2) material to the defense; and (3) possessed by the Government, which nevertheless failed to disclose it. *See United States v. Bartko*, 728 F.3d 327, 339 (4th Cir. 2013); *accord United States v. Bennett*, 464 F. App'x 183, 185 (4th Cir. 2012) ("To prevail on a *Brady* claim, a defendant must demonstrate that the evidence was exculpatory or impeaching in nature, was material to the defense, and was suppressed by the government either willfully or inadvertently."). "Favorable evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of [a] proceeding would have been different.'" *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also United States v. Jeffers*, 570 F.3d 557, 573 (4th Cir. 2009) ("[E]vidence is properly considered as 'material' if there is a 'reasonable probability' that its timely disclosure would have produced a different result."). "A 'reasonable probability' is a probability sufficient to undermine confidence in [an] outcome," *Bagley*, 473 U.S. at 682*; Bartko*, 728 F.3d at 340 (same), and is satisfied if "the favorable evidence could reasonably be taken to put the whole case in [] a different light." *United States v. Ellis*, 121 F.3d 908, 915–16 (4th Cir. 1997) (quoting *Kyles*, 514 U.S. at 431–32, 434, and stating that "a defendant does not have to show by a preponderance of the evidence that disclosure of the evidence would have resulted" in a different outcome).

## DISCUSSION

The Indictment offers few real details regarding the alleged scheme, which supposedly spanned almost seven years and resulted in a loss of nearly $10 million. Instead, it relies on broad and conclusory allegations that fail to distinguish between Defendants or adequately inform them of specific things they are alleged to have done.[6] What is clear, however, is the actual offenses charged: conspiracy, wire fraud, and mail fraud. Defendants seek the production of favorable information directly material to those charges.

Wire fraud requires the Government to "prove (1) that the defendant devised a scheme to defraud, and (2) that, to execute the scheme, the defendant transmitted any writing or signal by wire in interstate commerce." *United States v. Doty*, 832 F. App'x 174, 177–78 (4th Cir. 2020) (internal citation omitted). "Mail fraud requires the same two elements—substituting use of the mail for use of a wire." *Id.*; *accord United States v. Godwin*, 272 F.3d 659, 666 (4th Cir. 2001) (listing elements). Both statutes also require proving a scheme to defraud that both "deceive[s]"

---

[6] Because the Indictment is hopelessly sparse and vague regarding these and other key questions, Defendants moved for a bill of particulars. (*See* Dkt. 38.) That request remains pending, and this motion underscores the reasons why a bill of particulars remains necessary. Contemporaneously with this motion, Ms. Carrano has also moved to the dismiss the charges against her on similar grounds.

and "deprive[s] [another] of something of value." *Shaw v. United States*, 580 U.S. 63, 72 (2016); *accord United States v. Skinner*, No. 22-4001, 2023 WL 2770952, at *1 (4th Cir. Apr. 4, 2023) (same). And a conspiracy requires proof of "a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of the underlying substantive criminal offense.'" *Ocasio v. United States*, 578 U.S. 282, 287 (2016) (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)); *accord United States v. Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994) (stating that "the object of the conspiracy [must] be set forth sufficiently to identify the offense which the defendant is charged with conspiring to commit").

Based on Defendants' investigation thus far, the Government appears to possess additional material information regarding C&A, its internal investigation that determined drum purchases from KSC were likely legitimate, and the Government's own investigation into particular drum deliveries alleged to have been fictitious. As discussed more fully below, such information is both material and favorable to the defense.

### a. Evidence Concerning C&A's Internal Investigation

As noted above, C&A conducted an internal investigation into the circumstances of the alleged fraud that culminated in the Faegre Letter, the Faegre PPT, and a presentation to the FBI, all of which described the internal investigation and failed to find any fraud by KSC. (*See generally* Exs. A, C, D.) Among the bottom-line findings of that investigation, Faegre concluded that while "purchases from other packaging vendors . . . appear to have been substantially or entirely fraudulent," the "[p]ackaging purchases from NPS *appear to have been largely legitimate.*" (Ex. A at 12 (emphasis added).) And Faegre made no mention of any fraud by KSC, determining instead that purchases from both NPS and KSC appear to have been "legitimate container purchases." (*Id.* at 4, 12.) Faegre later reiterated to the FBI that "[a]lignment of container purchase invoices supported by email, along with overall usage estimates, indicates that the majority of 'legitimate' container purchases were made through NPS, Kearny, and, to a much lesser degree, Tunnel Barrel," and that "[p]urchases from certain vendors (NPS, Kearny) appear to be legitimate, but purchases from other vendors" were not. (Ex. D at 10, 21.) These conclusions are striking, since the Faegre Letter also claimed—as the Indictment alleges—that DiNoto "conspired with multiple individuals and vendors to induce C&A to pay false or inflated invoices for drums and containers" in return for kickbacks. (Ex. A at 1.) Unlike the Indictment, Faegre did not identify any evidence of wrongdoing by Defendants, either directly or through KSC and NPS. Because the results of C&A's internal investigation are starkly at odds with the Indictment's allegations, information concerning that investigation is overwhelmingly favorable to the defense.[7]

Information regarding C&A's internal investigation is material for a number of reasons. First, to the extent transactions with KSC were "legitimate container purchases" (*id.* at 4), it plainly refutes the Government's claims that any federal crime occurred. The Supreme Court has held that "the federal fraud statutes criminalize only schemes to deprive people of traditional property

---

[7]     Given its clear importance, the Government's refusal to provide information concerning C&A's internal investigation until requested by the defense—along with its refusal to identify even the most basic *Brady* information, *e.g.*, invoices indisputably reflecting real deliveries of real drums—is troubling, especially since Faegre already assembled and analyzed such information and the Government relied on information from Faegre's review to obtain a search warrant.

interests." *Ciminelli v. United States*, 598 U.S. 306, 309 (2023) (citing *Cleveland v. United States*, 531 U.S. 12, 24 (2000)); *cf. McNally v. United States*, 483 U.S. 350, 360 (1987) ("[W]e read § 1341 as limited in scope to the protection of property rights.").[8] And traditional property interests are not implicated where a scheme "denies the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions." *Ciminelli*, 598 U.S. at 313 (quoting *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015)). That distinction is crucial.

Even assuming that Defendants paid DiNoto secret kickbacks as alleged, if C&A ultimately received the drums that it purchased then such conduct at most deprived the Companies of their ability to make "discretionary economic decisions," which "cannot form the basis for a conviction under the federal fraud statutes." *Id.* at 313; *see United States v. Milheiser*, No. 21-50162, 2024 WL 1517377, at *7 (9th Cir. Apr. 9, 2024) ("The nature of the bargain requirement properly excludes from liability cases in which a defendant's misrepresentations about collateral matters may have led to the transaction but the buyer still got the product that she expected at the price she expected."); *United States v. Guertin*, 67 F.4th 445, 451 (D.C. Cir. 2023) (explaining that the statutes are limited "only to those schemes in which a defendant lies about the nature of the bargain itself"); *United States v. Porat*, 76 F.4th 213, 220–21 (3d Cir. 2023) (explaining that the federal fraud statutes are implicated only "when the false representation affects the very nature or value of the bargain"); *United States v. Takhalov*, 827 F.3d 1307, 1314 (11th Cir. 2016) (finding that nightclub owners did not commit fraud by hiring women to lure men into their nightclubs to buy drinks without revealing that the women were hired for that purpose); *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) (explaining that the federal fraud statutes do not reach schemes "that do no more than cause their victims to enter into transactions they would otherwise avoid"); *United States v. Regent Off. Supply Co.*, 421 F.2d 1174, 1179–81 (2d Cir. 1970) (finding no fraud where even "repugnant" lies or misrepresentations are "not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain" even where "money and property changed hands" as a direct result of "the untrue statements" and "false representations were made . . . with knowledge of their falsehood").

Second, since a scheme to defraud must both "deceive" and "deprive [another] of something of value," *Shaw*, 580 U.S. at 72, any evidence that C&A determined transactions with KSC were legitimate refutes this additional element. In particular, evidence that C&A found KSC was not involved in any fraud involving drum deliveries is obviously critical. Indeed, it is hard to imagine evidence in a fraud case *more* material than statements (and a full-blown internal investigation) by the erstwhile victim that disclaim fraud and vouch for the legitimacy of the very transactions now claimed by the Government to be fraud. Such evidence clearly would have a reasonable probability of undermining confidence in the Government's case and "could reasonably be taken to put the whole case in [] a different light." *Ellis*, 121 F.3d at 915–16.

Third, to the extent the Government reached a different conclusion than Faegre regarding fraud by KSC, the information on which Faegre relied would permit Defendants to challenge the Government's use and interpretation of information obtained from C&A. An internal investigation performed by sophisticated counsel with access to all relevant company information revealed that

---

[8]    Although the wire and mail fraud are embodied in separate statutes, *see* 18 U.S.C. §§ 1341, 1343, courts generally construe them similarly. *See Ciminelli*, 598 U.S. at 312 n.2 (internal citation omitted); *United States v. Adler*, 186 F.3d 574, 576 n.1 (4th Cir. 1999).

"the majority of [C&A's] legitimate container purchases" were made through KSC and NPS, which is powerful evidence that the Government has gotten it wrong regarding KSC. (Ex. A at 4.) That the Government simultaneously appears to *accept* Faegre's conclusion as to NPS, a company also owned by one of the Defendants, further undermines the reliability of the Government's investigation. In either scenario, information concerning C&A's internal investigation—including records or data collected, employee statements or communications, and specifics regarding any analysis conducted by C&A or the Government—may yield persuasive evidence that directly undermines a central Government argument: that fraud involving KSC occurred at all.

For these reasons, information concerning C&A's internal investigation is material to the defense both as to the Government's straightforward production obligations under *Brady* and *Giglio*, and pursuant to the corollary that the Government "may not knowingly use false evidence . . . to obtain a tainted conviction or allow it to go uncorrected when it appears," *Burr v. Jackson*, 19 F.4th 395, 410 (4th Cir. 2021) (quoting *United States v. Chavez*, 894 F.3d 593, 599 (4th Cir. 2018), "includ[ing] . . . evidence that 'though not itself factually inaccurate, creates a false impression of facts which are known not to be true." *Id.* (quoting *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967)). Evidence that C&A's internal investigation reached conclusions inconsistent with allegations in the Indictment would provide essential context necessary to ensure the jury receives an accurate picture of relevant facts.

Fourth, even if C&A later changed its tune regarding Faegre's exculpatory conclusions, information regarding its internal investigation would still be material for impeaching any C&A witnesses. Impeachment evidence is within the scope of the Government's *Brady* obligations. *See, e.g.*, *Giglio*, 405 U.S. at 154. And information regarding C&A's internal investigation would enable Defendants to challenge any statements by C&A personnel at trial supporting the Government's narrative but contradicting C&A's own prior assessment. *Cf. United States v. Kelly*, 35 F.3d 929, 938 (4th Cir. 1994) (reversing conviction where the government failed to produce letter written by the victim that could have been used to challenge her credibility). Moreover, information bearing on the credibility of any witnesses testifying about C&A's shipping drum purchases, transactions with KSC, internal investigation or evaluation of drum purchases, contacts with law enforcement, or other motivations are similarly material. *See Napue v. People of State of Illinois*, 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."). Without adequate information regarding C&A's internal investigation, Defendants will be unable to ensure that any evidence regarding allegedly fake drum deliveries fully and accurately reflects C&A's own assessment of its purported harm. *Cf. United States v. Sutton*, 542 F.2d 1239, 1243 (4th Cir. 1976) (reversing conviction where "the prosecution allowed a false impression to be created at trial when the truth would have directly impugned the veracity of its key witness").

### b. *Evidence Concerning the Government's Investigation of C&A's Purported Losses*

Defendants expect the Government's inability to prove that KSC actually failed to deliver shipping drums will be a central focus at trial. Given the manner in which the Government has defined the alleged scheme (*see* Dkt. 1 at 3 ¶ 10), drums that were purchased from KSC but supposedly never delivered to C&A are the only conceivable basis for C&A's alleged losses (and the Government's charges of fraud). So as discussed above, showing that paid-for drums were

actually delivered by KSC would demonstrate that C&A was not "deceive[d]" or "deprive[d]" of anything. *Shaw*, 580 U.S. at 72. And to the extent those drums were delivered, the alleged scheme is not cognizable under the federal fraud statutes because C&A got the benefit of its bargain with KSC. *See Milheiser*, 2024 WL 1517377 at *7; *Guertin*, 67 F.4th at 451; *Porat*, 76 F.4th at 220–21; *Takhalov*, 827 F.3d at 1314; *Shellef*, 507 F.3d at 108; *Regent Off. Supply Co.*, 421 F.2d at 1179–81. Information regarding the Government's investigation into whether drums were delivered is material because it may directly undermine the Government's legal theories and disprove its overarching claim that "drum deliveries . . . never took place." (Dkt. 1 at 5 ¶ 20.)

Although Defendants cannot be sure what material the Government has regarding an investigation into drum deliveries, it is clear that some must exist. After all, the Government presumably based its $9,887,793 forfeiture allegation on *something*. (*See id.* at 11 ¶ 3.) As far as Defendants can tell, however, no adequate basis for that figure is reflected in the tens of thousands of pages produced to date in discovery.[9] And the Government has refused to disclose how that number was calculated, which KSC invoices are included in that number as "false" invoices (*id.* at 4 ⁋ 17), and which KSC invoices were "true" and thus excluded from that total (*id.* at 5 ⁋ 19).

The dearth of information supporting the Government's loss estimation is puzzling and impedes Defendants' ability to analyze or challenge its determination. Rule 16 requires disclosure of anything the Government "intends to use . . . in its case-in-chief at trial" or that "is material to preparing the defense," Fed. R. Crim. P. 16(a)(1)(E)(i)–(ii), but it also excludes much that may be favorable to the defense, including "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case" and "statements made by prospective government witnesses." Fed. R. Crim. P. 16(a)(2). The only logical conclusion is that the Government calculated C&A's purported loss based on information that it believes to be outside Rule 16's scope.[10] But while Rule 16 may make exceptions for some material, *Brady* and *Giglio* do not. If information is material and "favorable to [the] accused," the Government is required to produce it irrespective of what Rule 16 might otherwise require. *Brady*, 373 U.S. at 87. Because that is the case with respect to the Government's investigation into fake drum deliveries—the only conceivable basis for C&A's alleged losses—it is obviously material.

That information also is likely favorable to the defense, since Defendants' review to date casts serious doubt on the Government's claim that KSC was involved in any fake deliveries. C&A's own internal investigation makes abundantly clear that others analyzing delivery information have failed to find any fraud associated with KSC; the most obvious example is the Faegre Letter, which summarized an exhaustive review of C&A's records that did not find any fraud in transactions involving Defendants. (*See* Ex. A at 4, 12; *see also* Exs. C, D (reiterating those determinations).) Defendants expect that information used by the Government to determine

---

[9] As noted previously, the mystery surrounding the origins of this forfeiture figure was also one of the bases for Defendants' pending motion for a bill of particulars. *See supra* note 6.

[10] Defendants are assuming that, as it has previously represented, the Government has fully complied with its Rule 16 obligations. At present, despite a number of discovery issues over several months, Defendants have no reason to doubt the Government's good faith. It goes without saying, however, that any failure to comply with Rule 16—especially regarding such a crucial subject matter—would be highly prejudicial to Defendants.

what deliveries, if any, were "fictitious" or otherwise to conclude that "drum deliveries . . . never took place" will actually refute the Government's fraud allegations. (Dkt. 1 at 4–5 ¶¶ 14, 20.) And any information in the Government's possession casting doubt on claims that C&A correctly tracked drum deliveries or inexplicably overlooked allegedly fictitious KSC deliveries for years likewise undermines the Government's case. Regardless, at a minimum the plethora of facts inconsistent with the Government's allegations demonstrates that information regarding allegedly fake drum deliveries is not so straightforward as the Government would have it. Thus, this information would be impeachment material or illustrate how the Government evidence at trial, "though not itself factually inaccurate," nevertheless "creates a false impression" by ignoring or minimizing facts detrimental to the Government's preferred narrative. *Burr*, 19 F.4th at 410 (quoting *Hamric*, 386 F.2d at 394). In all events, such information is favorable to the defense.

In particular, to the extent the Government's investigation relied on evidence from DiNoto, including any statements by DiNoto describing drum deliveries, the scope of the purported fraud, or C&A's processes and internal controls, that information is likely favorable to the defense and must be produced. No doubt the Government will argue that many statements by DiNoto are inculpatory and thus outside the scope of *Brady*,[11] but that view is mistaken for at least two reasons. To the extent DiNoto's statements contain any inconsistencies, they are textbook impeachment material. But even if his statements tend to support the Government's narrative against Defendants, those statements are still favorable to the defense if inconsistent with the conclusions of C&A's internal investigation, because any such inconsistencies would impeach testimony by DiNoto or other alleged co-conspirators. Moreover, DiNoto—the star of the Indictment and the sole indispensable party to the alleged fraud—is a relative of C&A's head executive. (*See* Ex. C at 2 (noting that DiNoto "is the cousin of C&A President and Chief Executive Officer").) That relationship alone raises questions about the knowledge of C&A's management regarding the alleged fraud (including whether C&A was really deceived), DiNoto's purported actions, and the motivations and credibility of C&A personnel who may testify—or decline to testify—in support of the Government's case at trial. Any information pertaining to DiNoto thus will permit the defense to challenge the Government's evidence or impeach C&A witnesses. *Brady* and *Giglio* thus require that such information be produced. *See Long v. Hooks*, 972 F.3d 442, 461 (4th Cir. 2020), *as amended* (Aug. 26, 2020) (quoting *Giglio*, 405 U.S. at 154 (internal quotation marks omitted)) ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility violates the Constitution.").

### c. *Exculpatory Evidence in the Government's Actual or Constructive Possession*

There is every reason to conclude that the Government possesses the information outlined above, which is both favorable to the defense and material. "*Brady*'s commands do not stop at the prosecutor's door" and "the knowledge of some of those who are part of the investigative team is imputed to prosecutors regardless of prosecutors' actual awareness." *Robinson*, 627 F.3d at 951. Thus, the Government is deemed to have possession of all information known to prosecutors, agents, and any "others acting on the government's behalf in the case." *Kyles*, 514 U.S. at 437. Moreover, "[w]hen the Government is in possession of material information that impeaches its

---

[11]   Again, Defendants assume that the Government has already undertaken to produce any obviously exculpatory statements or admissions by DiNoto.

witness or exculpates the defendant, it does not avoid the obligation under *Brady*/*Giglio* to disclose the information by not writing it down." *United States v. Rodriguez*, 496 F.3d 221, 222 (2d Cir. 2007). Here, the information outlined above is within the Government's possession because it was actually provided to prosecutors or agents, or because the Government relied upon it as a basis for its investigation.

First, there can be no dispute that statements by DiNoto are within the Government's possession. Information in the possession of a cooperating witness is not always deemed to be within the Government's possession. *But see United States v. Birbal,* 113 F.3d 342, 346 (2d Cir. 1997) (holding that knowledge may be attributed to the Government when it directs an informant to gather information); *United States v. Stein*, 488 F. Supp. 2d 350, 360 (S.D.N.Y. 2007) (finding that documents held by a third-party corporation were within the Government's possession because it could request them pursuant to a deferred prosecution agreement). Statements like the ones at issue here, though, which were made *to the Government or the investigating agents* during interviews or in other communications, plainly are within the Government's possession. Any such material should be produced to the defense.

Second, the Government certainly has possession of ample information concerning C&A and its internal investigation. For example, beyond its clear-cut conclusions, the Faegre Letter is replete with additional observations and findings that self-evidently are based on specific evidence contradicting the Government's claims. In particular, Faegre concluded that from a review of DiNoto's emails "that after C&A sent a payment to Tunnel Barrel or Hartford"—but, conspicuously, not KSC or NPS—"a portion . . . of that amount would be returned to [DiNoto] in the form of a kickback." (*Id.* at 5.) Faegre expressly described DiNoto's practice of emailing with certain other vendors as "suspicious," "striking," or otherwise concerning "[w]hen compared with [his] email communications with other drum vendors, *such as NPS and Kearny* . . . ." (*Id.* at 11 (emphasis added).) Faegre also noted that DiNoto's "email communications with both C&A accounting staff and Tunnel Barrel reflect that he took an extraordinary interest in their invoices and payments" as opposed to other vendors (like KSC and NPS), and that some emails from DiNoto "to Tunnel Barrel exhibit[] an unusual exchange between a vendor and customer which suggest something other than a normal, arms-length business arrangement." (*Id.* at 6.) And Faegre observed that communications showed "that Tunnel Barrel frequently and regularly sent FedEx packages to [DiNoto]." (*Id.*) Again, however, Faegre conspicuously made no similar claims with respect to invoices and payments for KSC and NPS. In short, the Faegre Letter references and relies on an extensive analysis of C&A's records, including emails and documents reflecting vendor and shipping information. All such evidence, including any statements by potential witnesses, notes, memoranda, communications, or interview reports, is exculpatory and should be produced to the defense if within the Government's possession.

While the Government has produced some material provided by C&A, Defendants believe that it possesses more for at least three reasons. First, the Government relied on the results of Faegre's investigation in an affidavit seeking a search warrant of KSC's property (*see* Decl., Ex. K ("Search Warrant Affidavit")), in which the Government was obligated to ensure no omissions of facts that could render the affidavit "misleading." *United States v. Tate*, 524 F.3d 449, 454–55 (4th Cir. 2008); *see also United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993) (explaining that an actionable omission occurs when "[a]ny reasonable person would have known that this was the kind of thing that the judge would wish to know"). For instance, the Search Warrant Affidavit

recounts key results of Faegre's investigation, including the discoveries of shell companies used by DiNoto and Kleinman, evidence of FedEx shipments to DiNoto, and estimates of total property loss.[12] (*See* Ex. K at 5, 13, 15, 21.) Given its obligations to the Court, it is hard to believe that the Government proffered those facts without any due diligence of its own regarding the underlying facts or records. And if the Government had access to such material, it is within its possession for *Brady* purposes.

Second, as noted above, Defendants are currently without any information to support the Government's almost $10 million forfeiture allegation, an amount the Government undoubtedly will attempt to reference at trial in the course of presenting its case. The Indictment alleges a scheme that purportedly spanned nearly seven years and identifies (albeit in a vague manner) emails and mailings that the Government claims were connected to specific, allegedly fraudulent, drum deliveries. How? Neither the Faegre Letter nor the Faegre PPT descends into such granular particularity about transactions with KSC, especially since both concluded that such transactions were legitimate. The Government must have based its selection of emails and mailings on other information. But what? Whatever it was, given the direct contradiction between the Government's allegations and the conclusions of C&A's internal investigation, the information on which the Government relied must be produced pursuant to *Brady* because it would serve as direct evidence of Defendants' innocence (if it supports Faegre's conclusions), evidence of a flawed investigation (if it reveals errors or gaps in the Government's reasoning compared to C&A's internal investigation), or impeachment material (if it is inconsistent with C&A's internal investigation).

Third, Defendants believe that the Government possesses undisclosed information because the Government's claims have shifted over time. For instance, when it first advanced a loss amount in the Search Warrant Affidavit in September 2021, the Government did not claim that KSC was responsible for *any loss* to C&A between 2017 and 2019. Instead, the entirety of an alleged $10.35 million overpayment from C&A to drum vendors during that period was attributed to two vendors: Tunnel Barrel and Hartford. (*See* Ex. K ¶¶ 6 ($10.35 million total overpayment), 8 ($9 million paid to Tunnel Barrel), 10 ($1.86 million paid to Hartford).) According to DiNoto's May 2022 plea agreement, however, the Government later decided that between January 2012 and January 2020, "DiNoto used other drum vendors besides [Tunnel Barrel] and Hartford to execute his scheme to defraud C&A and get additional kickbacks," and "[o]n behalf of those other drum vendors, DiNoto submitted and approved false invoices totaling approximately $9,197,181 . . . ." *See United States v. DiNoto*, Case No. 21-cr-00342-DKC, Dkt. 74 at 14 (D. Md. May 3, 2022). The reference to multiple "drum vendors" is consistent with C&A's internal investigation (though the inclusion of KSC and NPS in that group is not), but the Government's new loss amount now incorporated an aggregate overpayment from C&A to other "drum vendors" of approximately $9.2 million—about $700,000 *less* than the Indictment's forfeiture allegation. Finally, in September 2023, the Indictment provided yet another loss estimation, alleging that KSC *alone* was responsible for almost $9.9 million in loss. (*See* Dkt. at 11 ¶ 3.)

In sum, it appears that when the Government sought its search warrant in 2021, it believed that KSC was not responsible for any loss. About eight months later, something changed and the

---

[12]     The Search Warrant Affidavit inexplicably omitted, however, Faegre's obviously material and exculpatory findings. For this and other reasons, Defendants separately moved to suppress any evidence obtained pursuant to the search warrant that ultimately issued. (*See* Dkt. 67.)

Government now believed that KSC was responsible for some unknown portion of approximately $9.2 million in loss attributable to multiple vendors (assuming KSC was one of the unnamed "drum vendors" referenced in DiNoto's plea agreement).[13] And something changed again before this Indictment was filed, since by September 2023 the Government was claiming that KSC was solely responsible for approximately $9.9 million in loss—about $700,000 more than what the Government had previously attributed to *all* drum vendors put together. *Something* must have driven those changes in position, but it is not reflected in the discovery. At a minimum, these wild swings in value demonstrate that whatever Government relied upon at each stage is of high impeachment value.

As such, there is ample reason to conclude that the Government has undisclosed exculpatory information in its possession. Such information includes any statements favorable to the defense made by, or attributed to, DiNoto, C&A, or the Companies' employees. *See Giglio*, 405 U.S. at 154. It also includes any information provided to the Government by C&A, Faegre, or FTI, whether or not that information was told to prosecutors or formally memorialized. *See Robinson*, 627 F.3d at 951 (stating that "the knowledge of some of those who are part of the investigative team is imputed to prosecutors regardless of prosecutors' actual awareness"); *Rodriguez*, 496 F.3d at 222 (noting that the Government "does not avoid the obligation under *Brady/Giglio* to disclose [] information by not writing it down"). Because any such evidence likely undermines the very core of the charges in the Indictment or would permit impeachment of key government witnesses, it is "obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request." *Agurs*, 427 U.S. at 110. Nonetheless, Defendants *have* made specific requests. *See id.* at 106 ("When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable."). And for all the reasons described above, there is a reasonable probability that the information sought would "undermine confidence" in the Government's case, *Bartko*, 728 F.3d at 340 (same), or cast the facts in significantly "different light." *Ellis*, 121 F.3d at 915–16.

Finally, in these circumstances, the Court should order the Government to request any additional information pertaining to the matters identified in this motion from C&A. As noted, the allegations in the Indictment appear to be founded, at least in part, on C&A's internal investigation and its resulting referral to the FBI (though, for reasons unknown, the Government chose to ignore Faegre's conclusions that KSC had not been involved in any fraud). The Government appears to have relied on the results of C&A's internal investigation in the Search Warrant Affidavit. And the Government was able to request and receive records and information at its leisure from C&A—even long after the May 19, 2020 meeting—such as the Faegre PPT, reports and memoranda authored by C&A personnel (*see* Ex. B at 1), additional company materials "compiled" for the FBI (*id.*), oral requests for other information (*id.* at 1–2), and FedEx packages of even more materials (Ex. L at 1). If the Government effectively outsourced its investigation— and later relied on that investigation in representations made to the Court, including to obtain a search warrant—then the Government should be required to obtain from C&A, Faegre, and FTI any outstanding information concerning C&A's internal investigation. *Cf. McCormick v. Parker*, 821 F.3d 1240, 1247–48 (10th Cir. 2016) (finding that, for purposes of *Brady*, a private nurse "was

---

[13]     If KSC was *not* one of the one of the unnamed drum vendors referenced in DiNoto's plea agreement—or, more broadly, to the extent DiNoto failed to identify KSC as a fraudulent partner at any time—such an omission would itself be exculpatory.

part of the prosecution team because she acted at the request of law enforcement in the pre-arrest investigation of a crime"); *United States v. Connolly*, No. 16 CR. 0370 (CM), 2019 WL 2120523, at *12–14 (S.D.N.Y. May 2, 2019) (finding investigative actions by a private law firm were "fairly attributable to the Government" because "rather than conduct its own investigation, the Government outsourced the important developmental stage of its investigation"). That is especially true if law enforcement became aware of exculpatory information during interactions with C&A, Faegre, or FTI, but avoided actually obtaining it. (*See, e.g.*, Ex. G at 1 (stating that Faegre "did not provide the FBI with copies of the documents/exhibits referenced on the spreadsheet, and the FBI did not request them".) *Cf. Kyles*, 514 U.S. at 437 (noting duty "to learn of any favorable evidence known to the others acting on the government's behalf").

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court direct the Government to immediately produce the following:

(1)     All information concerning C&A's internal investigation, including, but not limited to, records and information underlying the Faegre Letter and the Faegre PPT; material provided to the Government by C&A, Faegre, or FTI; communications between the Government and C&A, Faegre, or FTI; information concerning any assumptions made by C&A, Faegre, or FTI in the course of the investigation; information concerning the availability or unavailability of relevant documentation; and any communications, notes, memoranda, financial or forensic analyses, and reports of interviews reflecting or regarding C&A's internal investigation;

(2)     All information concerning Eugene DiNoto and his relationship with C&A and its personnel, including, but not limited to, Richard Pisano, Jr., regardless of whether such information is memorialized in any notes, memoranda, internal analyses, or reports of interviews; and

(3)     All information concerning the Government's investigation of the Companies' purported losses, including, but not limited to, ledgers, invoices, inventories, receipts, bills of lading, delivery logs, mileage or other transport records, notes, memoranda, and financial or forensic analyses; information concerning the availability or unavailability of documentation; and reports of interviews regarding deliveries to C&A of shipping drums from or on behalf of KSC, C&A's procedures for counting and documenting such drums, and the bases and methods of valuation used to determine the $9,887,793 forfeiture amount alleged in the Indictment.

Dated: May 10, 2024
        New York, NY

                                        /s/ *Jarrod L. Schaeffer*

                                        David M. Eskew
                                        Jarrod L. Schaeffer

                                        ABELL ESKEW LANDAU LLP
                                        256 Fifth Avenue, 5th Floor
                                        New York, NY 10001
                                        deskew@aellaw.com (*pro hac vice*)
                                        jschaeffer@aellaw.com (*pro hac vice*)

Evan T. Shea
VENABLE LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
etshea@venable.com

*Counsel for Defendant Susan P. Carrano*