UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| | * |
| | * |
| v. | * |
| | *   **Criminal No. 23-cr-323-DKC** |
| | * |
| **MICHAEL VERZALENO, JR., ET AL.,** | * |
| | * |
| **Defendants.** | * |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR A *FRANKS* HEARING AND SUPPRESSION OF EVIDENCE**

**PRELIMINARY STATEMENT**

The government takes some remarkable positions in its Opposition brief.

*First*, the government disclaims any duty of candor to the courts. It says that it was free to accept Faegre/FTI's conclusions with respect to TB&D and Hartford, but reject them with respect to KSC based on its own "16-month independent federal investigation," (Dkt. 76 at 6), without explaining to the issuing magistrate why.[1] Faegre/FTI claimed that TB&D and Hartford defrauded C&A of more than $10 million. The government accepted those claims wholesale; there is a near one-to-one correlation between the Faegre/FTI PowerPoint (the culmination of Faegre/FTI's internal investigation) and the Special Agent's affidavit. Faegre/FTI also concluded that KSC did *not* defraud C&A. The government rejected that claim. The government was free to do so, but not without explaining to the issuing magistrate why it agreed with Faegre/FTI with respect to TB&D and Hartford's involvement in the fraud scheme, but disagreed with respect to KSC. To be clear, the government could have added a sentence to the affidavit to inform the magistrate that: "Faegre/FTI found that KSC's invoices 'appear to be legitimate,' but based on the government's own '16-month independent federal investigation,' the government has probable cause to believe that KSC also defrauded C&A." The government never wrote this, and in hiding this critical fact from the court, tricked the issuing magistrate into authorizing the Search Warrant.

Perhaps the government did not include this sentence because it could not. Maybe the 80 grand jury subpoenas and 60 bank accounts it has claimed to have issued and reviewed had little to do with KSC and Defendants. We do not know. But what we do know is the culmination of that "16-month independent federal investigation" yielded just five paragraphs in the Special Agent's affidavit and a single, purported "very incriminating" email. Dkt. 76 at 9. Had the

---

[1] Capitalized terms have the same meanings as in Defendants' Moving brief.

1

government actually conducted any investigation—and to be clear, Defendants do not believe the government did—the government would have reached the same conclusion as Faegre/FTI. The government's purported "very incriminating" email is included at ¶22 of the affidavit. Dkt. 67-3 at 23 ¶22. It references a payment from C&A to KSC of $122,000. If the government had investigated during those 16 months, it would have seen that the $122,000 payment corresponded to KSC invoice nos. 91336; 91410; 91533; 91541; 91542; and 91635. *See* Exhibit A at 2. On November 7, 2017, Antonietta Recupido, a KSC employee, sent an email to DiNoto and Aloma Miller, a C&A employee, attaching a customer open balance sheet that listed those invoices (among others). *Id.* at 1-2. Verzaleno, Jr. and Carrano were copied on the email. *Id.* at 1. Recupido wrote: "Attached, please find the open balance sheet. In order to keep your account at 90 days[,] the amount we should receive by Friday 11-10-17 is $109,563.02[.] Please let me know when a check will be going out." *Id.* at 1.

If the email in ¶22 of the affidavit is "very incriminating," this companion email is "very exculpatory." It was authored by a KSC employee uninvolved in any scheme to defraud and sent to a C&A employee uninvolved in any scheme to defraud seeking payment of open invoices. The government claims in its Opposition brief that the "pattern of interactions between DiNoto and all three drum vendors is virtually identical," (Dkt. 76 at 8), but it clearly was not. DiNoto was not corresponding with TB&D or Hartford employees about his fraud with Urcioli. He was corresponding directly with Urcioli. *See, e.g.,* Dkt. 67-3 at 16-17, 18-20 ¶¶ 13, 15. Verzaleno, Jr., on the other hand, was corresponding with DiNoto through KSC's billing department.

Nor did the government look very hard at the FedEx records during its 16-month investigation. Paragraph 23 of the Special Agent's affidavit alleges that on four separate occasions, KSC sent a FedEx to DiNoto, following which DiNoto made a cash deposit into one of his bank

accounts.  *See* Dkt. 67-3 at 23-24 ¶23.  But the Special Agent omitted from the affidavit that on three of those occasions, DiNoto received FedEx shipments from TB&D and from P. Fernicola Inc., another drum vendor that Faegre/FTI found had defrauded C&A, in the preceding days.[2]  The government apparently knew this, but again kept this information from the issuing magistrate.  *See* Dkt. 76 at 19 (noting that KSC sent FedEx packages to DiNoto "during the same period when other suspected drum vendors were sending FedEx packages" to him).

It is apparent that whatever the government did in the 16 months between the Faegre/FTI presentation and the Search Warrant did not involve any robust investigation of KSC.  The Special Agent cited to just one communication between Verzaleno, Jr. and DiNoto in his affidavit, and the $122,000 payment to which it refers is consistent with normal course billing; it is markedly different from the communications between Urcioli and DiNoto.  Likewise, the government could not definitively tie any FedEx shipments from KSC to any cash deposit by DiNoto.  On this slim record, the government stretched to conclude that KSC had defrauded C&A in the same way TB&D/Hartford had.  The one email and few FedEx records involving KSC were different in kind from those involving TB&D/Hartford, and, more importantly, *there was no loss to C&A attributable to KSC in the affidavit*.  So, the Special Agent hid from the issuing magistrate judge Faegre/FTI's conclusions to ensure the judge authorized the Search Warrant.  The government's omission worked.  A *Franks* hearing is required.

*Second*, the government persists in arguing that KSC committed PPP fraud.  It did not.  Very simply, a business was eligible for PPP funds even if without those funds it would have met payroll and continued operating.  With the uncertainties of the pandemic, the Paycheck Protection Program was intended to provide businesses with a cash infusion to avoid layoffs.  The warrant

---

[2]   Government's First Discovery Production, dated October 2, 2023 (FedEx records).

3

focuses on the wrong question to establish PPP fraud, providing evidence only of where the funds were deposited rather than if they were spent on eligible expenses. The government clings so tightly to its PPP fraud narrative because, without it, it is left with what was described previously—a single, "very incriminating" email that was not; cash deposits following FedEx shipments that could have been attributable to other drum companies; an admission that KSC caused no loss to C&A; and an omission that Faegre/FTI had concluded that C&A's purchases from KSC "appear to be legitimate." That is not sufficient to establish probable cause to search KSC.

*Third*, the government claims that the Search Warrant was not constitutionally overbroad. It was. To be clear, the Warrant authorized the government to search KSC for "all records and information," both physical and electronic, and seize "all records and information," both physical and electronic, related to KSC, Verzaleno, Sr., and Verzaleno, Jr. *See* Dkt 67-3 at 47-51. That was no substantive limitation. And there was no temporal limitation either, as the government admits. Dkt. 76 at 27. The only limitation was that the "all records and information" related to KSC, Verzaleno, Sr., and Verzaleno, Jr. also be related to conspiracy to commit wire and mail fraud, bank fraud (which there was no probable cause for because KSC did not commit PPP fraud), and tax evasion (which the government now admits was "inadvertently included in the [Search Warrant] attachment…" Dkt 76 at 28). Those broad criminal statutes did not create specificity in the Search Warrant where there was otherwise none.

There is a final, but significant, point. In defending its decision not to include any time limitation in its Search Warrant, the government argues that it was not possible to do so because C&A "did not know when the kickback scheme began, so the agents had no way of knowing either." Dkt. 76 at 27. The government continued, "the agents reasonably relied on the dates and information provided by C&A that the affiant summarized in the affidavit." *Id.* But that is precisely

4

Defendants' point. At the time of the Search Warrant application in September 2021, the government continued to rely on the findings of the Faegre/FTI investigation, but without including the Faegre/FTI conclusion that KSC was not involved in the fraud.

Defendants are entitled to a *Franks* hearing, and the Court should suppress all evidence seized by the government pursuant to its unconstitutional Search Warrant.

I.   **ARGUMENT**

   a. **A *Franks* Hearing Is Required.**

The government spends much of its response ignoring the core question for a *Franks* hearing, did "the affiant intentionally or recklessly omit[] material information from the affidavit." *United States v. Wharton*, 840 F.3d 163, 168 (4th Cir. 2016). The clear and unambiguous answer here is yes. The Special Agent included nearly every part of Faegre/FTI's report regarding alleged fraud at C&A to establish probable cause, except for Faegre/FTI's conclusion that KSC was not involved in the kickback scheme. A fact that suggests that the target of an investigation is innocent of the allegations is "clearly critical 'to a finding of probable cause,'" and thus "[r]ecklessness may be inferred from omission of [such] facts." *DeLoach v. Bevers*, 922 F.2d 618, 622-623 (10th Cir. 1990) (quoting *Hale v. Fish*, 899 F.2d 390, 400 (5th Cir.1990)); *see also Golino v. City of New Haven*, 950 F.2d 864, 871 (2d Cir. 1991) ("recklessness may be inferred where the omitted information was critical to the probable cause determination"); *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000) ("omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know.").

The government would have the Court believe that *less* evidence of an alleged crime gives a magistrate judge *more* probable cause to authorize a search. *See* Dkt. 76 at 23 ("inclusion of Faegre's preliminary finding that Kearny Steel was 'legitimate' and not a participant in DiNoto's kickback scheme might have strengthened the magistrate judge's probable cause determination.")

5

That position is nonsensical, and patently absurd. How can a finding by C&A's internal investigation that KSC was not involved in the fraud strengthen probable cause to search KSC for evidence of that fraud? It cannot. The government did not include Faegre/FTI's conclusion that KSC was a legitimate supplier because had it, the magistrate judge would have found that KSC was not involved in DiNoto's scheme and would have refused to sign the warrant. *See United States v. Perkins*, 850 F.3d 1109, 1117–18 (9th Cir. 2017) (holding that the search warrant application was not supported by probable cause where the "omissions reveal[ed] a clear, intentional pattern in Agent Ensley's actions: he selectively included information bolstering probable cause, while omitting information that did not. We have recognized that an affiant can mislead a magistrate '[b]y reporting less than the total story, [thereby] . . . manipulat[ing] the inferences a magistrate will draw"); *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993) (holding that the search warrant was not supported by probable cause because the affidavit omitted information "that the dog had not given its trained response when confronted with a package containing drugs, [and that] the dog handler[] admi[tted] that he could not say with certainty that drugs were in the package").

The exclusion of this plainly exculpatory evidence is all the more striking given that the government adopted the conclusions of the Faegre/FTI report in every other respect and presented them to the magistrate.[3] For example, Faegre/FTI determined that the total amount of the fraudulent invoices was approximately $10.35 million. The government included the same loss number in its affidavit. *See* Dkt. 67-3 at 12 ¶6. FTI determined that C&A paid approximately $9

---

[3] The government argues that the absence of the single email between KSC and DiNoto (¶22 of the affidavit) in the Faegre/FTI report casts doubt on the report's conclusions that KSC was not involved. Dkt. 76 at 18. Once again, the government's arguments strain credulity. The more likely explanation for its absence is that the email is innocuous and not indicative of fraud, *see supra*.

6

million to TB&D and $1.86 million to Hartford.[4] The government included those same numbers in the affidavit. *See* Dkt. 67-3 at 14, 15 ¶¶8, 10. So, both Faegre/FTI and the government agreed that the total loss to C&A was approximately $10 million, and the total amount C&A paid to TB&D and Hartford was roughly the same.[5] The government cannot on the one hand adopt Faegre/FTI's numbers (and include them in the affidavit), but reject Faegre/FTI's conclusion that KSC was not involved (and omit that from the affidavit) without providing the magistrate judge any explanation. For all of its ballyhooing about its extensive 16-month investigation, the government used the Faegre/FTI report as the heart of the probable cause it advanced before the magistrate, with the sole omission being that KSC's sales "appear to be legitimate." *See* Dkt. 67-5 at 21.

A *Franks* hearing is required to allow the Court to evaluate the Special Agent's purported explanation for omitting obviously exculpatory information from the magistrate judge's consideration.

      **b.  The Government's Attempts to Bootstrap Probable Cause for KSC Fails.**

In its response, the government does not dispute its bootstrapping probable cause for KSC based on evidence involving TB&D and Hartford, but instead argues that probable cause to search KSC exists based on the "similarities between the way DiNoto interacted with all three of the drum vendors listed in the affidavit" and that "[t]hose commonalities…provided the magistrate with very persuasive evidence that Kearny Steel was benefitting from DiNoto's kickback scheme just like

---

[4]    Government's Sixth Production dated March 29, 2024 (FTI spreadsheet).

[5]    Inexplicably, the government has alleged a $9.9 million forfeiture number in the indictment without any explanation of how it calculated that number given its previous acceptance of Faegre/FTI's loss numbers.

7

the other two companies." Dkt. 76 at 7-8.  The government's alleged "similarities" presented to this Court are anything but.

The twelve paragraphs laid out over ten pages in the affidavit detail an elaborate scheme through which DiNoto, and his accomplice Elliot Kleinman, received kickbacks from TB&D and Hartford. Dkt. 67-3 at 13-22 ¶¶8-19.  TB&D and Hartford sent numerous checks to DiNoto and Kleinman recorded in the companies' bank records. The checks were made out to Sandpiper Enterprises and EDK Management, which were shell companies operated by DiNoto and Kleinman respectively. Extensive email correspondence confirmed the kickback scheme, including detailed instructions on how the payments should be calculated and split between DiNoto and Kleinman. Two of the emails contained pictures of handwritten notes calculating the amount of the kickbacks and the divisions to DiNoto and Kleinman via Sandpiper and EDK Management. Indeed, the affidavit connected (*i*) specific TB&D and Hartford invoices to (*ii*) the photographed calculations of kickback payments that were included in email correspondence and (*iii*) to the records of deposits in the accounts of Sandpiper and EDK Management. Put simply, the affidavit detailed evidence of every step in the chain to establish the sale of fraudulent steel drums to C&A from TB&D and Hartford, and the resulting kickback payments to DiNoto and Kleinman.

By contrast, in the meager five paragraphs in the affidavit related to KSC, the government does not put forth any "similarities" of a scheme, or modus operandi as existed with TB&D and Hartford. Specifically:

- The affidavit does not include any allegations that KSC issued checks to DiNoto as kickbacks.

- The affidavit does not include any allegations that KSC made payments to Sandpiper Enterprises or EDK Management.

- The affidavit does not contain any allegations that KSC paid Kleinman anything.

- The affidavit does not include any suspicious email communications between KSC and DiNoto.[6]

- The affidavit does not include any handwritten notes detailing kickback payments between KSC and DiNoto.

- The affidavit does not include specific KSC invoices tied to payments to DiNoto.

All that the affidavit alleges in those five paragraphs are FedEx shipments—that alone is insufficient to establish probable cause. The government's claim to this Court that "the affidavit established the same *modus operandi* for all three drum vendors," Dkt. 76 at 5, is completely baseless and belied by the affidavit itself. As a last-ditch effort, the government goes so far as to argue that "[t]he principal offices for all three companies were in or near Newark, New Jersey." Dkt. 76 at 8. As if mere residency in the same city as TB&D and Hartford was sufficient to establish probable cause to search KSC. That is preposterous.

In sum, putting aside the extensive allegations against TB&D and Harford, the scant evidence the government alleges against KSC in its five paragraphs is insufficient to establish probable cause. After an allegedly extensive 16-month investigation with 80 grand jury subpoenas and a review of 60 bank accounts, the only evidence of KSC's involvement in the DiNoto fraud is a single, innocuous email and the existence of FedEx shipments. *See* Dkt. 76 at 3. Such evidence

---

[6] In its Opposition, the government protests that there are "other pertinent Kearney [sic] Steel emails" beyond that cited in ¶22 of the affidavit. But as this Court well knows, a probable cause determination is based on the information included in the search warrant affidavit presented to the issuing magistrate, not the government's after-the-fact representations to the Court made in opposition to a motion to suppress.

9

cannot establish probable cause to conduct a limitless search of an entire business (and seize every scrap of its paper and byte of its data) for criminal fraud.[7]

### c. The Government's Response Misunderstands the Evidence Needed to Establish Probable Cause for PPP Fraud.

In its opposition, the government confuses the evidence needed to establish probable cause of fraud with respect to the Paycheck Protection Program.  Simply put, the issue is not *where* the money received from a PPP loan was deposited, but rather *how* that money was used.  As outlined in the affidavit, the PPP program "required loan proceeds to be used only for certain expenses, including payroll costs, mortgage interest, rent, and utilities." Dkt. 67-3 at ¶36. To support its allegation that KSC applied for a loan and sought forgiveness of it "based on the misrepresentation that the loan proceeds had been spent on qualified business expenses," the affidavit focused on deposits into the Verzalenos' accounts. Dkt. 76 at 11.  But that focus is misplaced.

Where the Verzalenos deposited the funds is not evidence that they were misspent.  The affidavit did not contain any evidence to suggest that KSC used the PPP loan amount improperly or misrepresented the cost of its payroll, rent, and utilities in the PPP loan application.  Instead, the affidavit had a single conclusory sentence, unsupported by any evidence, that the loan proceeds were not used for legitimate KSC business expenses. That sentence alone does not provide a "substantial basis for determining the existence of probable cause" of fraud. *See Illinois v. Gates,* 462 U.S. 213, 239 (1983).

---

[7] The government cannot overcome these unconstitutional deficiencies with conclusory statements about the Special Agent's past experience. Dkt. 76 at 10; *See United States v. Brinkley,* 980 F.3d 377, n.7 (4th Cir. 2020) (finding that "experience does not establish probable cause" and that "[e]xperienced officers … may not render the probable cause requirement a 'toothless tiger' through reliance on 'cop-on-the-beat intuition[s]'") (citing *United States v. Rutkowski,* 877 F.2d 139, 142 (1st Cir. 1989)).

And, notably, the government continued its pattern of omission in describing the alleged PPP "fraud." It hid from the issuing magistrate judge that KSC's PPP loan had been forgiven months before the government's Search Warrant application.

### d. The Limitless Warrant Violates the Fourth Amendment.

The government next tries to salvage its Search Warrant by claiming that it was not overbroad, because it was cabined to specific entities and individuals and certain categories of documents. The government's purported limits are no limits at all.

First, the government claims that the search warrant was sufficiently particular because it limited the search to "all records and information" related to the "entities and individuals" listed in Paragraph 1a—a list that included KSC and its two owners, Verzaleno, Sr. and Verzaleno, Jr. *See* Dkt. 76 at 25-26. A search of a corporation that is "delineated" to the entire corporation and its owners is not particular.[8] *Id.* at 23. Next, the government claims that the warrant is limited to "specific items and categories of documents." *Id.* at 25.[9] These "specific items and categories of documents" include a wide-ranging description that captures every single type of business record that might be found at a drum company.[10] Indeed, it is impossible to think of a business record that would have been excluded from the government's sweeping description of relevant records.

---

[8] Moreover, the seizing agents did not even follow the Warrant's purported limits to entities and individuals identified in Paragraph 1a, having seized numerous business records related to National Packaging Services, Inc., a separate company that was not listed anywhere in the affidavit.

[9] Specifically, the Warrant authorizes seizure of "[a]ny and all documents related to financial transactions…including container and drum invoices, manufacturing records, inventory sheets, payroll records, bills of lading, corporate ledgers, accounts payable and receivable, receipts, general ledgers, accounting journals, the use of interstate carriers, and storage and transportation records." Dkt. 67-3 at 3 ¶ 5.

[10] The government cites a number of cases for the proposition that in certain cases a warrant may specify broad categories of documents. Dkt. 76 at 24. Here, however, the government's limiting category is simply a catch-all that permits seizure of virtually all documents.

*See United States v. Leary*, 846 F.2d 592, 602 (10th Cir. 1988) (warrant lacked particularity because "the list of business records to be seized [did not] provide any meaningful limitation on the [] search. The warrant encompassed virtually every document that one might expect to find in a modern export company's office.").

In another indication of the warrant's overbreadth, the government concedes that the warrant allowed agents to seize documents without temporal limitation, but excuses this shortcoming because it argues that the constitution does not require a date limitation.[11] However, where, as here, a search warrant exhibits a "patent lack of particularity," that failing is "compounded by the absence of any date restriction on the items to be seized" and the warrant violates the Fourth Amendment. *United States v. Vilar*, 2007 WL 1075041, at *23 (S.D.N.Y. Apr. 4, 2007); *United States v. Nejad*, 436 F. Supp. 3d 707, 724 (S.D.N.Y. 2020) (collecting cases) (noting that although a temporal limitation may not "constitute a formal, universal requirement" for a warrant's validly, courts consistently find "warrants for the seizure of [business] records constitutionally deficient where they imposed too wide a time frame or failed to include one altogether") (internal citations omitted). As a fallback position, the government contends that the 26 federal agents seizing KSC property were constrained by the "temporal scope made apparent in the affidavit." But there is no evidence that the seizing agents read or even had access to the underlying affidavit or understood the "temporal scope made apparent" within it. Dkt. 76 at 27.

The last potential limitation on which the government attempts to rest is that the warrant authorized a search for evidence related to wire fraud, money laundering, bank fraud and tax

---

[11]   In support of this proposition, the government cites out-of-circuit caselaw and an abrogated Fourth Circuit case, *United States v. Shilling,* which does not contain the quote the government cites. Instead, the quote appears in an unpublished opinion, *Slaey v. Adams*, 2008 WL 5377937, at *16 (E.D. Va. Dec. 23, 2008).

evasion.[12] But it is well settled that where, as here, a warrant's only limitation are broad statutes, that warrant violates the Fourth Amendment. *See United States v. Dickerson*, 166 F.3d 667, 694 (4th Cir. 1999) *rev'd on other grounds*, 530 U.S. 428, 120 (2000) ("a warrant authorizing a search for evidence relating to 'a broad criminal statute or general criminal activity' such as 'wire fraud,' 'fraud,' 'conspiracy,' or 'tax evasion,' is overbroad because it provides no readily ascertainable guidelines for the executing officers as to what items to seize.") (internal quotation omitted); *United States v. Maxwell*, 920 F.2d 1028, 1033 (D.C. Cir. 1990) ("Although a warrant's reference to a particular statute may in certain circumstances limit the scope of the warrant sufficiently to satisfy the particularity requirement … it will not do so where … the warrant authorizes seizure of all records and where … the reference is to a broad federal statute, such as the federal wire fraud statute.  References to broad statutes realistically constitute no limitation at all on the scope of an otherwise overbroad warrant and therefore cannot save it.") (internal citation omitted); *Rickert v. Sweeney*, 813 F.2d 907, 909 (8th Cir. 1987) (warrant authorizing seizure of records that were evidence of violations of the conspiracy and tax evasions statutes lacked particularity because those "statutes do not limit the search in any substantive manner"); *United States v. Cardwell*, 680 F.2d 75, 77 (9th Cir. 1982) ("The only limitation on the search and seizure of appellants' business papers was the requirement that they be the instrumentality or evidence of violation of the general tax evasion statute, 26 U.S.C. § 7201. That is not enough.").

---

[12] The government concedes that the inclusion of tax fraud was in error, but nevertheless maintains that the government was permitted to seize "any and all" tax documents associated with KSC and the Verzalenos under the broad description outlined in the Search Warrant and the other enumerated statutes. The government's argument on this point crystallizes the overbreadth problem with the Warrant.

e. **The Government Cannot Rely on the *Leon* Good Faith Defense for Its Unconstitutional Actions.**

As a last-ditch effort to avoid suppression, the government cursorily appeals to the good-faith exception to the exclusionary rule, arguing that the agents "did not engage in any of the conduct that the exclusionary rule seeks to deter." Dkt. 76 at 11, 31. Not true. For almost half a century, it has been black-letter law that the government cannot mislead a magistrate judge in order to obtain a search warrant. Candor to the court is not a new concept.

Yet, the government is advocating exactly that. The Special Agent omitted clearly exculpatory information from the warrant affidavit, which prevented the magistrate from properly weighing the pertinent facts to determine probable cause. That is not good-faith conduct. Where, as here, "a *Franks* hearing is appropriate and an affiant's material perjury or recklessness is established by a preponderance of the evidence, the warrant must be voided and evidence or testimony gathered pursuant to it must be excluded. A warrant that violates *Franks* is not subject to the good-faith exception to the exclusionary rule[.]" *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (internal citation omitted).

Nor is it good faith to seek or execute the precise kind of general, unconstrained warrant the Framers abhorred. The warrant here allowed for the limitless search and seizure of any record found at KSC related to the business or its two owners—this is classic "general, exploratory rummaging." *United States v. Uzenski*, 434 F.3d 690, 706 (4th Cir. 2006). The Supreme Court has long recognized that "a warrant may be so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Groh v. Ramirez*, 540 U.S. 551, 565, (2004) (quoting *Leon*, 468 U.S at 923); *see also United States v. Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996) (quoting *Leon*, 468 U.S at 923) (holding that the good-faith exception does not apply "when the warrant is based on an

14

affidavit containing 'knowing or reckless falsity'" or "when the affidavit does not 'provide the magistrate with a substantial basis for determining the existence of probable cause;'" or "when the warrant is so 'facially deficient' that an officer could not reasonably rely on it"). No federal agent, even one brand new (which the Special Agent was not), could think he or she was acting in good faith by omitting relevant exculpatory information from the affidavit or executing a limitless warrant authorizing the seizure of every scrap of physical and digital paper of a company and its owners.

## II. CONCLUSION

Based on the foregoing, the warrant to search KSC was unconstitutional and resulted in an illegal search and seizure. Accordingly, this Court should order a *Franks* hearing, and the evidence seized pursuant to it, and the fruits of that evidence, must be suppressed.

Dated: May 28, 2024

/s/ *George P. Varghese*
George P. Varghese
Benjamin Conery
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
George.Varghese@wilmerhale.com (*pro hac vice*)
Benjamin.Conery@wilmerhale.com (*pro hac vice*)

Lee Vartan
Melissa Wernick
CHIESA SHAHINIAN & GIANTOMASI PC
105 Eisenhower Parkway
Roseland, NJ 07068
(973) 325-1500
lvartan@csglaw.com (*pro hac vice*)
mwernick@csglaw.com (*pro hac vice*)
*Counsel for Defendant Michael G. Verzaleno, Jr.*

/s/ *Zach Intrater*
Zach Intrater
AGNIFILO INTRATER LLP
445 Park Avenue, 7th Floor
New York, NY 10022
(917) 721-7331
zach@agilawgroup.com (*pro hac vice*)
*Counsel for Defendant Michael Verzaleno, Sr.*

/s/ *David M. Eskew*
David M. Eskew
ABELL ESKEW LANDAU LLP
256 Fifth Avenue, 5th Floor
New York, NY 10001
(646) 970-7340
deskew@aellaw.com
(*pro hac vice*)
*Counsel for Defendant Susan P. Carrano*

## CERTIFICATE OF SERVICE

I certify that, on May 28, 2024, this document was electronically filed with the Clerk of Court using the Court's CM/ECF system, which will then serve a notification of the filing to the registered parties of record.

<u>/s/ George P. Varghese</u>
George P. Varghese
