IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| | : |
| UNITED STATES OF AMERICA | |
| | : |
| | |
| v. | : Criminal No. DKC 23-0323 |
| | |
| | : |
| MICHAEL VERZALENO, JR., ET AL. | |
| | : |

**MEMORANDUM OPINION**

Defendants Michael Verzaleno, Jr., Michael Verzaleno, Sr., and Susan Carrano (collectively, "Defendants") are charged in a multi-count indictment (the "Indictment") with (1) conspiracy to commit wire and mail fraud; (2) fourteen counts of wire fraud; and (3) three counts of mail fraud. Susan Carrano ("Ms. Carrano") is also charged in Count Nineteen with making a false statement. The alleged scheme involved fraudulent invoices for purchases of commercial drum containers and kickbacks. Defendants' company is identified as Kearney Steel Container Corporation ("KSC") (a seller of commercial drum containers) and other entities are identified as the "Companies."[1]  Other individuals named in the

---

[1] The "Companies" [capital C] are identified by letters. Company A, headquartered in New York, formulated and produced oils and extracts used in the food industry.  Company A is Citrus & Allied Essences Ltd.  Company B was affiliated with Company A.  It is Trilogy Essential Ingredients.  The two had manufacturing facilities in Maryland.  To ship their products, the Companies used large, steel, plastic, and fiber drums as containers which they purchased from vendors located in various states.

Indictment are Eugene DiNoto ("Mr. DiNoto") and John Criscuolo ("Mr. Criscuolo").  Mr. DiNoto is described as a resident of Maryland employed as the facilities manager of the Companies until January 2020.  He was responsible for fulfilling drum purchase orders on behalf of the Companies, requiring him to arrange and negotiate the prepurchase, transportation, and storage of the requisite number of drums.  He reviewed and authorized the payment of drum invoices submitted by drum suppliers doing business with the Companies.  Once approved, the drum invoices were sent from Maryland to the accounting department at the Companies' headquarters in New York for payment.  Mr. Criscuolo is described as a resident of New Jersey "who worked as a salesman for companies [lowercase c] that sold and distributed commercial drum containers."  (ECF No. 1, at 2).

The Indictment alleges that the Defendants, along with Mr. DiNoto and Mr. Criscuolo,

> did knowingly devise and intend to devise a
> scheme and artifice to defraud the Companies
> and to obtain money and property from the
> Companies by means of materially false and
> fraudulent pretenses, representations, and
> promises, that is, the defendants knowingly
> submitted and caused to be submitted false
> purchase invoices for drums that fraudulently
> overstated the amount of money the Companies
> owed Kearney Steel Container Corporation, and
> in return for DINOTO'S approval and submission
> of those false invoices for payment, the
> defendants gave DINOTO and CRISCUOLO a share
> of the inflated invoice amounts in the form of
> cash kickbacks[.]

(*Id.* at 3).

Count One alleges that, from in or about September 2013 until in or about January 2020, the Defendants conspired with Mr. DiNoto and Mr. Criscuolo and others "to commit mail fraud and wire fraud, that is, to knowingly execute and attempt to execute the scheme to defraud through the use of the U.S. Postal Service, interstate common carrier, and interstate wires[.]" (*Id.*). The Indictment alleges that bills were transmitted for "thousands of drums" that were never intended to be delivered, that delivery receipts were falsified, and that "intermittently" true KSC invoices were submitted to the Companies for actual drum deliveries. (*Id.* at 4-5). Counts Two through Fifteen are wire fraud charges, each based on an email relating to a specific invoice. Counts Sixteen through Eighteen charge separate offenses of mail fraud for FedEx packages sent from New Jersey to Maryland. Count Nineteen, against Ms. Carrano only, charges her with making false statements during an interview at the Office of the United States Attorney in Maryland.

## I.   Motion to Dismiss

Ms. Carrano, joined later by the other Defendants, has moved to dismiss the Indictment pursuant to Rule 12 of the Federal Rules of Criminal Procedure, contending that the Indictment fails to inform her (and them) adequately of the nature of the accusations with reasonable certainty, and fails to allege venue for some of the counts. (ECF No. 70, at 3-4).

3

"A valid indictment must:  (1) allege the essential facts constituting the offense; (2) allege each element of the offense, so that fair notice is provided; and (3) be sufficiently distinctive that a verdict will bar a second prosecution for the same offense."  *United States v. Bolden*, 325 F.3d 471, 490 (4th Cir. 2003).  Use of statutory language can, in some circumstances, be sufficient, if "the words used in the indictment 'fully, directly, and expressly, without any certainty or ambiguity, set forth all the elements necessary to constitute the offence[.]'" *United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  The *Brandon* court went on to state:

> However, simply parroting the language of the statute in the indictment is insufficient. When the words of a statute are used to describe the offense generally, they "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged."  [*Hamling*, 418 U.S.] at 117–18 (internal quotation marks omitted).  Thus, the indictment must also contain a "statement of the *essential facts* constituting the offense charged."  Fed.R.Crim.P. 7(c)(1) (emphasis added); *see United States v. Smith*, 44 F.3d 1259, 1263 (4th Cir.[]1995).

*Id.*

## A. Counts One through Eighteen

The three Defendants contend that the Indictment fails to allege any action by any particular Defendant, relying instead on

4

impermissible "group pleading."    (ECF No. 70, at 16-17).    The
Indictment alleges that the three Defendants conspired with two
named individuals and others to commit mail and wire fraud and
made a secret arrangement with the named individuals to send false
KSC invoices to bill the Companies for thousands of drums that
Defendants never intended to deliver.    The relationships of the
three Defendants to KSC, all alleged to reside in New Jersey, were
set forth:  Michael Verzaleno Jr. as an owner and vice-president,
Michael Verzaleno Sr. as an owner and president, and Susan Carrano
as the controller.  In the manner and means section, the Indictment
alleges that false KSC invoices were regularly sent to the drum
companies, false delivery receipts were prepared as a pretense for
billing,   KSC   and   Defendants   received   the   checks   for   the
fraudulently billed amounts and they paid the named individuals a
portion  of  the  falsely  billed  amount  in  the  form  of  a  cash
kickback, either through FedEx or in person.  The checks for the
fictitious deliveries were deposited into KSC's business account
where they were used to pay business expenses or transferred /
withdrawn to pay personal expenses.

    Each Defendant is alleged to have entered into the agreement
willfully, which is sufficient for the conspiracy count.  For each
of the substantive wire or mail fraud counts, the Defendants are
alleged to have transmitted and caused to be transmitted by wire,
or caused to be delivered by FedEx, the particular item, for the

purpose of executing and attempting to execute the scheme to defraud.  Defendants want to know, and think the Indictment should allege, how each of them did any of those things with regard to the specific wire or mailing.  (ECF No. 70, at 18-19).

The Government points out that "it is 'not necessary for the defendant to be directly or personally involved in the wire communication as long as that communication was reasonably foreseeable in the execution or the carrying out of the alleged scheme to defraud in which the defendant is accused of participating.'"  (ECF No. 77, at 9) (quoting *United States v. Taylor*, 942 F.3d 205, 214 (4th Cir. 2019)).  *Taylor* in turn cites to *United States v. Burfoot*, 899 F.3d 326, 335 (4th Cir. 2018), in which the United States Court of Appeals for the Fourth Circuit explained that "[o]ne 'causes' the use of a wire communication when one acts with knowledge that such use 'will follow in the ordinary course of business' or where such use 'can reasonably be foreseen, even though not actually intended.'"  *Burfoot*, 899 F.3d at 335 (quoting *United States v. Pierce*, 400 F.3d 176, 180 (4th Cir. 2005)).  Thus, the Indictment need not specify that, or how, each Defendant personally participated in the wire or mailing, and the Indictment is not deficient in that manner.

Counts Two through Fifteen, in contrast to the other counts, allege that the offense occurred "in the district of Maryland" without the addition of "and elsewhere."  (ECF No. 1, at 6).  Based

6

on that, Defendants contend that only intrastate conduct is alleged. (ECF No. 70, at 21).

First, the Indictment alleges that the wires were interstate: those counts allege, in part, that "defendants . . . did knowingly transmit and cause to be transmitted in interstate commerce, by means of wire communications," a particular email. (ECF No. 1, at 6). Second, the interstate nexus requirement is a jurisdictional requirement, not a substantive element of the crime. *Taylor*, 942 F.3d at 214. The specific facts underlying the interstate nexus do not need to be contained in the Indictment. Here, after the interstate nature of the wire is alleged, the Indictment describes an email from a particular party to a different party. This is sufficient. *See, e.g.*, *United States v. Scott*, 494 F.Supp.3d 61, 65 (D.Mass. 2020).

Defendants also contend that the absence of specific locations means that venue is insufficiently pled as well. (ECF No. 70, at 25). "When deciding a pretrial motion to dismiss an indictment for improper venue, the district court assesses only whether the allegations of the indictment, if true, would suffice to establish venue." *United States v. Powers*, 40 F.4th 129, 134 (4th Cir. 2022) (citing *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012)). For offenses like those charged here, the issue may not be straightforward:

> Mail and wire fraud are "continuing offense[s]," which may be prosecuted anywhere the offense "was begun, continued, or completed," including "any district from, through, or into which" the mail or wire communication moved. 18 U.S.C. § 3237(a); *see also Ebersole*, 411 F.3d at 525, 527; *see also United States v. Bowens*, 224 F.3d 302, 309 (4th Cir. 2000) (noting that, for some offenses, there may be "more than one appropriate venue, or even a venue in which the defendant has never set foot" (citations omitted)).  Mail and wire fraud are defined by two essential elements:  "(1) the existence of a scheme to defraud and (2) the use of the mails or wire communication in furtherance of the scheme." *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006); *see also* 18 U.S.C. §§ 1341, 1343. But only the second element constitutes the "essential *conduct* element" for purposes of determining venue.  *United States v. Jefferson*, 674 F.3d 332, 366 (4th Cir. 2012). In other words, venue will not lie everywhere the fraudster schemed, but venue is proper in any district associated with misuse of the mail or wires in furtherance of the scheme or "any acts that cause such misuse." *Id.* (internal quotation marks omitted).

*Powers*, 40 F.4th at 134–35.  Here, the Indictment alleges that each wire occurred in the District of Maryland.  That is sufficient.

For the foregoing reasons, there is no deficit in the allegations for the conspiracy, wire, or mail fraud counts.

**B. Count Nineteen**

Ms. Carrano argues that this count must be dismissed because the alleged false statements do not meet the necessary standard, that of being literally untrue and facially incorrect.  (ECF

No. 70, at 26-31).  She contends that the Indictment only alleges contradictions, not falsehoods.  (*Id.*).  In part, that count alleges:

> [T]he defendant stated that she did not know the reason why KSC had the address of DINOTO's personal residence in Maryland, when, in truth and fact, as the defendant then and there knew, she and other KSC employees regularly sent cash payments via FedEx to the address of DINOTO's personal residence from August 2015 to December 2019;

> [T]he defendant stated that she and other KSC employees only used FedEx to send gifts, like baseball tickets, to customers, when, in truth and fact, as the defendant then and there knew, she and other KSC employees used FedEx to regularly send cash payments to DINOTO's residence in Maryland from August 2015 to December 2019; and

> [R]egarding the words "Gene paid" handwritten by the defendant on a QuickBooks summary of transactions, the defendant stated that she did not know what was paid to "Gene," when, in truth and fact, as the defendant then and there knew, she and other KSC employees regularly sent cash payments via FedEx to DINOTO's personal residence from August 2015 to December 2019.

(ECF No. 1, at 9-10).  Ms. Carrano relies on *United States v. Good*, 326 F.3d 589 (4th Cir. 2003) and *United States v. Baer*, 92 F.App'x 942 (4th Cir. 2004), for the proposition that the statements are not actionable because they may be literally true and factually correct in that, at best, they are ambiguous.  (ECF No. 70, at 26-27).  With regard to the first statement, she complains that there is a disconnect between whether she knew "why" KSC had Mr. DiNoto's

home address and her knowledge of the cash payments sent there. (*Id.* at 27-28).  With regard to the second statement, Ms. Carrano essentially ignores the word "only" and then suggests that cash kickbacks could be customer gifts.  (*Id.* at 28-29).  For the third statement, Ms. Carrano argues that, while she might have known of payments to Mr. DiNoto, she might not have known that the specific notation referred to that "Gene" or to a kickback payment.  (*Id.* at 29-30).  She also contends that none of the three are alleged to be material or even related to the scheme to defraud.  (*Id.* at 30-31).

These laments do not provide a basis to dismiss this count. First, the prior allegations of the Indictment are incorporated in Count Nineteen, thus tying the statements to the alleged scheme to defraud.  Second, the deficiencies seen in *Good* and *Baer* are far more direct, clear, and concrete.  Here, Ms. Carrano's arguments are better addressed to the factfinder.

## II.  Motion for a Bill of Particulars

Defendants' joint motion seeks information in what they identify as five areas:  (a) how the invoices from KSC to the Companies are fraudulent and what products were never delivered; (b) what the involvement of Mr. Criscuolo in the alleged kickback scheme was; (c) what particular conduct each of the Defendants is alleged to have engaged in regarding the seven emails allegedly sent by Defendants in the wire fraud counts; (d) the same with

regard to the three mail fraud counts, as to who mailed the packages, to whom they were sent, the amount of U.S. currency inside, or how/why the mailings furthered the scheme; and (e) the details of the civil forfeiture amount being sought. (ECF No. 38, at 2-3).

Pursuant to Rule 7(f), a court may direct the Government to file a bill of particulars. That action "is appropriate when an indictment fails to provide adequate information to allow a defendant to understand the charges and to avoid undue surprise." *United States v. Leahy*, 598 F.App'x 210, 212 (4th Cir. 2015). It is not designed to provide discovery or to provide a detailed disclosure of the Government's evidence. *United States v. Currie*, No. 10-cr-0532-RDB, 2011 WL 1527014, at *1 (D.Md. Apr. 20, 2011) (citing *United States v. Automated Med. Labs., Inc.*, 770 F.2d 399, 405 (4th Cir. 1985)). Furthermore,

> [w]here the government provides the defendant with extensive pretrial disclosure of its evidence supporting the charges alleged in an indictment, a court may deny a bill of particulars. *See United States v. Parker*, 91 F.3d 135, 1996 WL 383916, at *2 (4th Cir. 1996) (per curiam) (unpublished table decision); *United States v. Soc'y of Indep. Gasoline Marketers of Am.*, 624 F.2d 461, 466 (4th Cir. 1979); *United States v. Schembari*, 484 F.2d 931, 934-35 (4th Cir. 1973).

*United States v. Chacona*, 633 F.Supp.3d 751, 759 (E.D.N.C. 2021).

The Government responds that the combination of allegations in the Indictment and information provided via discovery, from

search warrant affidavits, and via witness debriefings provides sufficient notice to Defendants. (ECF No. 43, at 2-7). Further access to the Government's evidence will come in normal process as the parties prepare for trial. In reply, Defendants continue to insist that they do not have the notice that they should have: precisely which transactions are allegedly fraudulent, the roles they and others played in the scheme, or how the scheme amounted to nearly $10 million. (ECF No. 46, at 2-3). They point out that the discovery provided does not include any transaction documents prior to September 2016, yet the alleged conspiracy dated back to September 2013. (*Id.* at 1). They also state that the Government plans to provide significantly more discovery despite having stated earlier that most of the discovery already had been provided. (*Id.* at 2 n.1).

At the hearing, the Government stated that it has provided "packets" of information regarding each wire and each mailing, including the false invoices with related documents, bank records, emails, the billing packet, the delivery ticket, the paid receipt, the ledger entry, the account statement, and the Fed Ex record for each one of the wires or mailing. It also relies on ECF No. 79, an expert disclosure notice, indicating that it proposes to call Special Agent Rachel Solomon to describe her review of accounting and bookkeeping procedures and records as to how the drum purchases were handled. Specifically, she would describe how Citrus and

Allied Ltd. ("C&A") would sign the purchase order when drums were delivered, and that the yellow copy would stay with C&A and the white copy would go back to the main office in New Jersey to generate the invoice or bill, a process that would be different from the non-deliveries of drums.  She will discuss two different ledgers.

The Government will not be required to amplify further.

With regard to Mr. Criscuolo, Defendants point to the lack of detail, arguing that he appears in the introductory portion of the Indictment and is never described doing anything, except getting money.  (ECF No. 38, at 5-6).  His role is otherwise unclear.  To the contrary, he, as a salesman for drum sellers, is alleged to have been part of the group that devised the scheme to defraud, to have received a portion of the kickbacks in cash in person, and to have made a secret arrangement with Defendants and Mr. DiNoto to send false KSC invoices.

The forfeiture allegations are not contained-and should not be included-in a count of an indictment.  Rather, an indictment must contain notice that the Government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute.

This Indictment alleges in part that:

> Upon conviction of any of the offense set forth in counts One through Eighteen of this Indictment, the defendants . . . shall forfeit

> to the United States, pursuant to 18 U.S.C.
> § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any
> property, real or personal, which constitutes
> or is derived from proceeds traceable to the
> scheme to defraud.
>
> [] The property to be forfeited includes,
> but is not limited to, a money judgment in the
> amount of at least $9,887,793.

(ECF No. 1, at 11).  "The indictment or information need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks." Fed.R.Crim.P. 32.2(a).  The Government is not required to include any amount sought in the Indictment.  *United States v. Poulin*, 690 F.Supp.2d 415, 422-23 (E.D.Va. 2010), *aff'd*, 461 F.App'x 272 (4th Cir. 2012) (discussing Rule 32.2 both before and after the December 1, 2009 amendment).  The Advisory Committee Notes state that "[t]he court may direct the government to file a bill of particulars to inform the defendant of the identity of the property that the government is seeking to forfeit or the amount of any money judgment sought if necessary to enable the defendant to prepare a defense or to avoid unfair surprise."  Fed.R.Crim.P. 32.2 advisory committee's note to 2009 amendment.  None of the examples cited relate to this case where a money judgment, and not forfeiture of specific property, is being sought and the amount is already stated.  Nothing more is required.

14

Defendants have already been given notice of the amount of a money judgment being sought.  They are not entitled to have the Government articulate how that figure was reached.

Accordingly, the Motion for a Bill of Particulars will be denied.

## III. Request for *Brady* Material

Acknowledging that the Government has represented that it has provided all information required by *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), Defendants nevertheless contend that the Government's assessment of the value of certain categories of evidence is deficient and they ask the court to direct the Government to provide certain information now, rather than closer to or at trial.  (ECF No. 73, at 3-5).  The Government disagrees and asserts that it has acted in good faith and provided the defense with all required material. (ECF No. 78, at 1-2).

> Due process requires that in a criminal prosecution, the government must disclose to the defendant evidence favorable to him if the suppression of that evidence would deny him a fair trial.  "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."  *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).  The Court in *Brady* held that the prosecution's suppression of evidence that is favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or

> bad faith of the prosecution." *Id.* And
> evidence *favorable to the defendant* includes
> not only exculpatory evidence but also
> evidence that the defendant can use to impeach
> government witnesses. *See Giglio v. United
> States*, 405 U.S. 150, 153–54, 92 S.Ct. 763, 31
> L.Ed.2d 104 (1972); *United States v. Bagley*,
> 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d
> 481 (1985).

*United States v. Blankenship*, 19 F.4th 685, 692 (4th Cir. 2021).

When looking retrospectively, as typical appellate cases do of

necessity, the standard is:

> Nonetheless, "the Constitution is not
> violated every time the government fails or
> chooses not to disclose evidence that might
> prove helpful to the defense." *Id.* at 436–
> 37, 115 S.Ct. 1555. Rather, the suppressed
> evidence must be materially favorable to the
> accused — that is, the nondisclosure must be
> "so serious that there is a reasonable
> probability that the suppressed evidence would
> have produced a different verdict." *Strickler
> v. Greene*, 527 U.S. 263, 281, 119 S.Ct. 1936,
> 144 L.Ed.2d 286 (1999). Stated otherwise, the
> question is whether "the favorable evidence,"
> "considered collectively," "could reasonably
> be taken to put the whole case in such a
> different light as to undermine confidence in
> the verdict." *Kyles* [*v. Whitley*], 514 U.S.
> [419,] 435–36, 115 S.Ct. 1555 [(1995)]
> (emphasis added).

*Id.* This is a pretrial motion to force the Government to do more,

and in some instances, to provide material now that may be provided

nearer to trial. Just as with the motion to dismiss and the motion

for a bill of particulars, Defendants' attempt to get earlier

disclosure of evidence fails. They have not identified any

particular item that the court can ascertain now falls within the parameters of *Brady* and *Giglio*.

## IV. Motion to Suppress Evidence Seized Pursuant to a Search Warrant

A search warrant was executed at KSC in New Jersey based on an affidavit covering two other businesses (Tunnel and Barrel and Hartford) as well.  Defendants contend that the affidavit lacked probable cause for their business, was not sought in good faith, was deficient because of a material omission (justifying a hearing under *Franks v. Delaware*), and lacked particularity.  (ECF No. 67, at 3-5).

> A search warrant may not issue without probable cause.  *United States v. Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020) (citing U.S. Const. amend. IV).  Probable cause means "a fair probability that contraband or evidence of a crime will be found in a particular place."  *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).  A judge's decision to issue a search warrant is reviewed with "great deference" -- they need only "a 'substantial basis' for finding probable cause."  *United States v. Jones*, 942 F.3d 634, 638 (4th Cir. 2019) (quoting *Gates*, 462 U.S. at 236-38, 103 S.Ct. 2317).  As applied to warrants, the Fourth Amendment's "particularity" requirement means "the executing officer reasonably can ascertain and identify from the warrant the place to be searched and the items to be seized."  *Blakeney*, 949 F.3d at 861 (citing *United States v. Owens*, 848 F.2d 462, 463 (4th Cir. 1988)).

*United States v. Briscoe*, 101 F.4th 282, 294 (4th Cir. 2024).

Here, the affidavit easily meets the standard of probable cause. Defendants would require a level of skepticism that is not appropriate to the oversight at this juncture. The scheme to defraud was amply established by the affiant and so was the link to KSC.

Frankly, somewhat more troubling is the argument that the warrant lacked particularity as to the items to be seized, despite the length of the list. Ultimately, however, the court concludes that the warrant did not lack particularity as to the items to be seized.[2]

Attachment B-2 is entitled Items to be Seized. It reads:

ATTACHMENT B-2

ITEMS TO BE SEIZED

1. All records and information related to violations of 18 U.S.C. § 1349 (conspiracy to commit wire and mail fraud); 18 U.S.C. § 1956/(a)(1)(A)(ii)8&(B) (a) (money laundering); 18 U.S.C. § 1344 (bank fraud); and 26 U.S.C. § 7201 (tax evasion), more fully set forth below, including financial transactions, correspondence, and communications related to the following entities and individuals:

---

[2] Counsel was asked what remedy might be appropriate if a particularity violation were found. He said that complete suppression was necessary, despite *Leon* good faith. *United States v. Leon*, 468 U.S. 897 (1984). Neither side discussed the "severance doctrine" adopted by the Fourth Circuit in *United States v. Cobb*, 970 F.3d 319 (4th Cir. 2020). If particularity was lacking due to some overbroad descriptions, those would be excised and items fitting within the permissible scope would not be suppressed.

     a. Citrus & Allied Essences Ltd, Trilogy Essential Ingredients, Inc., Kearny Steel Container Corporation, Tunnel Barrel & Drum, Co., Hartford Fibre Drum, Inc., Sandpiper Enterprises, EDK Management, LLC, Main Street Cigars, Eugene Andrew DiNoto, Elliott Dennis Kleinman, Anthony Urcioli, Sr., Anthony Urcioli, Jr., Michael Verzaleno, Sr., and Michael Verzaleno, Jr.

     2. Any and all records related to the communication methods used by and in support of the entities named in paragraph 1, including email, telephone, facsimile, and websites.

     3. Any and all correspondence related to the commission and concealment of the criminal scheme.

     4. Any and all financial records related to bank accounts and credit accounts owned, controlled, or opened on behalf of the entities or individuals described in paragraph 1, including bank statements, checks, loan records, credit card records, Paycheck Protection Program records, check registers, lines of credit, deposit records, wire transfer details, and money transfer records.

     5. Any and all documents related to financial transactions executed as part of the scheme, including container and drum invoices, manufacturing records, inventory sheets, payroll records, bills of lading, corporate ledgers, accounts payable and receivable, receipts, general ledgers, accounting journals, the use of interstate carriers, and storage and transportation records.

     6. Any and all Federal, State, and/or Local tax documents associated with the entities and individuals named in paragraph 1, including Forms W-2, W-4, W-9, 1040, 1120, and 1099.

7. Address and/or telephone books, and any other papers reflecting names, addresses, telephone numbers or email accounts related to the foregoing entities and individuals.

8. All appointment books, schedules, calendars, list of contacts, telephone message slips, phone records, diaries, memos, and all other similar items.

9. Any records, documents, programs, applications, and materials that show indicia of occupancy, residency, control and/or ownership of the Subject Premises, including but not limited to utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes, keys, photographs, and bank records.

10. Photographs of co-conspirators, associates, and assets.

11. Safes and their contents.

12. Storage-facility records and safe-deposit box records and keys.

13. United States currency, coins, and monetary instruments.

14. Computers, computer hardware, cellular telephones, software, related documentation, passwords, data security devices (as described below), videotapes, and or video recording devices, and data that may constitute instrumentalities of, or contain evidence related to the specified criminal offenses. The following definitions apply to the terms as set out in this affidavit and attachment:

a. Computer hardware: Computer hardware consists of all equipment, which can receive, capture, collect analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes any data-

processing devices (including but not limited
to cellular telephones, central processing
units, laptops, tablets, eReaders, notes,
iPads, and iPods; internal and peripheral
storage devices such as external hard drives,
thumb drives, SD cards, flash drives, USB
storage devices, CDs and DVDs, and other
memory storage devices); peripheral
input/output devices (including but not
limited to keyboards, printer, video display
monitors, and related communications devices
such as cables and connections), as well as
any devices mechanisms, or parts that can be
used to restrict access to computer hardware
(including but not limited to physical keys
and locks).

b.    Computer    software    is    digital
information, which can be interpreted by a
computer and any of its related components to
direct the way they work. Software is stored
in electronic, magnetic, or other digital
form. It commonly includes programs to run
operating    systems,    applications,    and
utilities.

c.    Documentation:    Computer-related
documentation consists of written, recorded,
printed, or electronically stored material,
which explains or illustrates how to configure
or use computer hardware, software, or other
related items.

d. Passwords and Data Security Devices:
Computer passwords and other data security
devices are designed to restrict access to or
hide computer software, documentation or data.
Data security devices may consist of hardware,
software or other programming code. A password
(a string of alpha-numeric characters) usually
operates a sort of digital key to "unlock"
particular data security devices. Data
security hardware may include encryption
devices, chips, and circuit boards. Data
security software of digital code may include
programming code that creates "test" keys or
"hot" keys, which perform certain pre-set

21

security functions when touches. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

As used above, the terms "records, documents, messages, correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created, modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

15. For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER'") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f. evidence of the times the COMPUTER was used;

g. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER; and

i. contextual information necessary to understand the evidence described in this attachment.

16. With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

a. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

23

b. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

c. "scanning" storage areas to discover and possible recover recently deleted files;

d. "scanning" storage areas for deliberately hidden files; or

e. performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

f. If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

17. With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative

> team may continue to review any information
> not segregated as potentially privileged.

(ECF No. 67-3, at 3-7).

Defendants argue that the fruits of the search must be suppressed due to the generality and breadth of the description of the things to be seized.  (ECF No. 67, at 16).  They assert that the warrant permitted the agents "to seize practically any item related to KSC, Michael Verzaleno, Sr., or Michael Verzaleno,Jr. – without any temporal limitation." (*Id.*).  The list includes tax information and the Government concedes that category was included inadvertently inasmuch as this business was not alleged to be involved in tax offenses.  (ECF No. 76, at 28).  Defendants concede that the warrant purported to identify specific items, but claim that the list is "so exhaustive that it names every conceivable item that might be found."  (ECF No. 67, at 16).

The Government, in contrast, asserts that "[a] warrant authorizing a search for evidence relating to 'specific illegal activity' provides 'readily ascertainable guidelines' from which an agent can identify the items to be seized with reasonable certainty.   (ECF No. 76, at 24) (quoting *United States v. Dickerson*, 166 F.3d 667, 694 (4th Cir. 1999), *rev'd on other grounds*, 530 U.S. 428 (2000)).  It also contends that specific documents are not required to be described in "complex" cases, but a "reasonable list of general business records" suffices.  (ECF

No. 76, at 24) (first citing *Andresen v. Maryland*, 427 U.S. 463, 480 n.10 (1976); then citing *United States v. Hurwitz*, 459 F.3d 463, 473-74 (4th Cir. 2006)).

The overall standard, for particularity and overbreadth, must be applied in light of the specific circumstances of each case:

> With respect to particularity, the Fourth Circuit has made clear that a warrant generally satisfies the Fourth Amendment's particularity requirement where "the warrant identifies the items to be seized by their relation to designated crimes and when the description of the items leaves nothing to the discretion of the officer executing the warrant." *United States v. Dargan*, 738 F.3d 643, 647 (4th Cir. 2013) (quoting *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010)). At the same time, Fourth Circuit precedent requires that courts "refrain from interpreting warrant terms in a 'hypertechnical' manner, and . . . instead employ a 'common sense and realistic' approach." *Id.* (quoting *Williams*, 592 F.3d at 519). In this regard, "[t]he degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved." *In re Grand Jury Subpoena*, 920 F.2d 235, 239 (4th Cir. 1990) (quoting *United States v. Torch*, 609 F.2d 1088, 1090 (4th Cir. 1979)).
> The related concept of breadth requires that the scope of the warrant "be limited by the probable cause on which the warrant is based." [*United States v.*] *Hill*, 459 F.3d [966,] 973 [(9th Cir. 2006)] (internal citation and quotation marks omitted). In this respect, the Supreme Court has made clear that probable cause exists where there is a "fair probability that contraband or evidence of a crime will be found" in the premises to be searched. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). This fair probability is the kind of

> probability "on which reasonable and prudent
> people, not legal technicians, act." *Florida
> v. Harris*, 568 U.S. 237, 244, 133 S.Ct. 1050,
> 185 L.Ed.2d 61 (2013) (internal quotation
> marks and brackets omitted).  And importantly,
> "[a] magistrate's 'determination of probable
> cause should be paid great deference by
> reviewing courts.'" *Gates*, 462 U.S. at 236,
> 103 S.Ct. 2317 (quoting *Spinelli v. United
> States*, 393 U.S. 410, 419, 89 S.Ct. 584, 21
> L.Ed.2d 637 (1969)).

*United States v. Manafort*, 323 F.Supp.3d 795, 801–02 (E.D.Va. 2018).

Ultimately, Defendants' argument rests on a "hypertechnical" approach, contending that the items to be seized are not really limited by the language in paragraph 1 and 1a, or the scope of "the criminal scheme" as set forth in the affidavit and application. *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir. 1993); (ECF No. 67-3, at 3).  Presenting a single affidavit in support of applications for more than one location does invite confusion, if not worse.  Here, though, Mr. DiNoto was the unifying connection and made the consolidation logical.

The identification of the criminal statutes and the entities and individuals in paragraph 1 and 1a does serve to limit the scope of the warrant.  It does not authorize seizure of all business records of KSG.  The absence of a time limit, again, is troublesome, but not fatal.  Looking for records and evidence regarding the scheme provides a temporal limitation without calling it such.  When read in light of "the criminal scheme"

27

described in the application, the items to be seized are sufficiently particularized and the warrant was not a general one.

Defendants argue that there is "no evidence that the seizing agents read or even had access to the underlying affidavit[.]" (ECF No. 82, at 13). The Government obviously believes otherwise. (ECF No. 76, at 27). Again, it would be better for the incorporation or attachment to be explicit, either in the warrant or in the Government's presentation in its motion papers. In the Fourth Circuit, a separate document may be used to determine particularity if it is either referred to in the warrant or attached to it. *Hurwitz*, 459 F.3d at 471. The wording need not be precise:

> In the instant case, the search warrant states that "there is probable cause to believe the property and person described in the application on the reverse side [of the warrant] and related to the commission of a crime is located as described in the application." Gov't.'s Resp. Ex. 1 [DE-170-1] at 1. Further, the warrant instructs law enforcement to "search the premises, vehicle, person and other place or item described in the application for the property and the person in question." *Id*. The words of incorporation used are not overly precise, but such specificity is not required. *See Hurwitz*, 459 F.3d at 471-72.

*United States v. Oliver*, No. 4:22-cr-61-FL, 2024 WL 629969, at *3-4 (E.D.N.C. Jan. 29, 2024), *report and recommendation adopted*, No. 4:22-cr-61-FL-3, 2024 WL 627979 (E.D.N.C. Feb. 14, 2024). The warrant in this case refers to the application and the affidavit

as the basis for probable cause and the B-2 list refers to "the criminal scheme" as well as the named entities and individuals. (ECF No. 67-3).  The intent to limit the list of items to those relevant to the particular scheme set forth in the affidavit is clear.

Even if the warrant were deficient, the officers were entitled to rely on it.

> Even assuming, *arguendo*, that the search warrant for defendant's residence was fatally overbroad and lacking in the requisite particularity, suppression would not be warranted given that the searching agents acted in good-faith reliance on the warrant. As the Supreme Court explained in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the question whether evidence should be excluded "is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'"  *Id*. at 907, 104 S.Ct. 3405.  This is so because the exclusionary rule is neither "a personal constitutional right" nor is it "designed to redress the injury occasioned by an unconstitutional search[.]"  Instead, as the Supreme Court has made clear, the exclusionary rule "is a prudential doctrine, created by [the Supreme Court] to compel respect for the constitutional guaranty" and to deter future Fourth Amendment violations by law enforcement.  *Davis v. United States*, 564 U.S. 229, 236-37, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011) (internal quotations and citations omitted).  Given these principles, the Supreme Court has sensibly declined to apply the exclusionary rule "when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid" because in those cases, exclusion produces very few deterrent benefits when compared to the "'substantial

> social costs' generated by the rule."  *Id.*
> (quoting *Leon*, 468 U.S. at 922, 104 S.Ct.
> 3405).

*Manafort*, 323 F.Supp.3d at 805–06.  This warrant, even if the affidavit and application technically cannot be consulted, was not so bare bones as to preclude good faith reliance on its directive.[3]

Nor have Defendants presented a basis for conducting a *Franks* hearing.

> To obtain a *Franks* hearing, a defendant
> must make a "substantial preliminary showing"
> to overcome the "presumption of validity with
> respect to the affidavit supporting the search
> warrant." [*United States v.*] *Moody*, 931 F.3d
> [366,] 370 [(4th Cir. 2019)] (citations and
> quotation marks omitted); *see also Franks* [*v.
> Delaware*], 438 U.S. [154,] 171, 98 S.Ct. 2674
> [(1978)] (defendant's "attack must be more
> than conclusory and must be supported by more
> than a mere desire to cross-examine").  When
> a defendant relies on an omission, this heavy
> burden is even harder to meet. [*United States
> v.*] *Tate*, 524 F.3d [499,] 454–55 [(4th Cir.
> 2008)].  In that situation, a defendant must
> provide a substantial preliminary showing that
> (1) law enforcement made an omission; (2) law
> enforcement made the omission "knowingly and
> intentionally, or with reckless disregard for
> the truth," and (3) the inclusion of the
> omitted evidence in the affidavit would have
> defeated its probable cause. [*United States
> v.*] *Colkley*, 899 F.2d [297,] 300–01 [(4th Cir.
> 1990)].  If the district court finds that a
> defendant has made this threshold showing, it
> must hold a *Franks* hearing to develop evidence
> on the affidavit's veracity.  *Id.* at 301.  If
> after the hearing the defendant establishes
> "perjury   or   reckless   disregard"   by   a

---

[3] Furthermore, as noted earlier, the remedy for an overbroad warrant is to suppress the items seized improperly, and not to suppress those properly within the scope.

> preponderance of the evidence and shows that
> the inclusion of the omitted evidence would
> defeat the probable cause in the affidavit,
> "the search warrant must be voided and the
> fruits of the search excluded." *Franks*, 438
> U.S. at 156, 98 S.Ct. 2674; *see also Colkley*,
> 899 F.2d at 300-01.

*United States v. Haas*, 986 F.3d 467, 474 (4th Cir. 2021) (footnote

omitted).

> To establish the "intentionality" prong
> under *Franks*, Lull must show by a
> preponderance of the evidence that
> Investigator Welch omitted information with
> the intent to mislead the magistrate or that
> he omitted the information with reckless
> disregard of whether it would make the
> affidavit misleading. Understandably, the
> defendant's burden in showing intent is
> greater in the case of an omission because
> "[a]n affiant cannot be expected to include in
> an affidavit every piece of information
> gathered in the course of an investigation."
> [*Colkley*, 899 F.2d at 300]. A showing that
> the officer acted negligently, or that the
> omission was merely an innocent mistake, is
> insufficient to warrant suppression. *Miller
> v. Prince George's Cty.*, 475 F.3d 621, 627-28
> (4th Cir. 2007) (citing *Franks*, 438 U.S. at
> 171, 98 S.Ct. 2674).

*United States v. Lull*, 824 F.3d 109, 115-16 (4th Cir. 2016). The

*Lull* court referred to the standard articulated by the Eighth

Circuit in *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir.

1993): "Any reasonable person would have known that this was the

kind of thing the judge would wish to know."

The so-called omission relied on by Defendants is the

"conclusion" in the Faegre/FTI "report" that invoices submitted by

KSC were legitimate.  (ECF No. 67, at 13).  First, it is far from clear that there was any unequivocal "finding" by the firm's investigators.  The information that could have been included would have been that at least some of the invoices from some of the vendors were legitimate (perhaps an obvious conclusion) and that the immediately available records cast more suspicion on some vendors than on others.  KSC was one of the legitimate vendors.  There was certainly no conclusion that KSC could not have been involved in the fraudulent activity.

Moreover, Defendants have not made the necessary showing of intentionality.  The issuing judge was told that there had been an investigation by the victim company that prompted the Government to launch its own investigation.  And some of what the Government found paralleled what had been found by the lawyers.  As relevant to the locations in New Jersey for which the warrant was being sought, there was a third company with suspicious conduct—more than 100 FedEx packages sent to Mr. DiNoto's home followed on at least four occasions by cash deposits into Mr. DiNoto's account.  The email exchange quoted in the affidavit supports the inference that Mr. DiNoto was also receiving kickbacks from KSC.  Judges do not need to read more background information than is useful—the preliminary thoughts of the law firm were not the type of information that the issuing judge would want to know.

Finally, inclusion of tentative preliminary thoughts of whether the KSC invoices were wholly, or only partially, legitimate would not defeat the probable cause present in the affidavit.  The request for a *Franks* hearing will be denied.

A separate order will follow.

_____
/s/
DEBORAH K. CHASANOW
United States District Judge
