```
                    IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF MARYLAND
                              NORTHERN DIVISION

- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :
                                 :
        v.                       :   Criminal No. 21-CR-00342-LKG
                                 :
EUGENE ANDREW DINOTO,            :
                                 :
            Defendant.           :
                                 :
- - - - - - - - - - - - - - - - x   November 3, 2021

                                        Baltimore, Maryland
```

**VIRTUAL DETENTION HEARING**

BEFORE:  MAGISTRATE JUDGE THOMAS M. DIGIROLAMO

APPEARANCES:              MARTIN J. CLARKE, ESQ.
                          HARRY M. GRUBER, ESQ.
                          Office of the United States Attorney
                          36 S. Charles Street
                          Suite 400
                          Baltimore, Maryland  21201
                            On Behalf of the Government

                          SEDIRA S. BANAN, ESQ.
                          Office of the Federal Public Defender
                          100 S. Charles Street
                          Tower II 9th Floor
                          Baltimore, Maryland  21201
                            On Behalf of the Defendant

Also Present:             Nikki Martin, Pre-Trial Services

Audio Operator(s):        Telita Davis
                          Yasmine Kelly

Transcription Company:    CompuScribe
                          P.O. Box 789
                          Cheltenham, Maryland  20623
                          (301)577-5882

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

*CompuScribe*
*(301) 577-5882*

<u>I N D E X</u>

Page

Detention Recommendation

   by Martin J. Clarke, Esq.
   On Behalf of the Government                      4

   by Sedira S. Banan, Esq.
   On Behalf of the Defendant                       28

   by Mr. Martin J. Clarke, Esq.                  40

   by Ms. Sedira S. Banan, Esq.                   45

Ruling by the Court                                    51

Keynote: "---" indicates inaudible in the transcript.
        "*" indicates phonetically spelled in transcript.

1            In addition to the over half a million dollars I
2    mentioned earlier that he liquidated prior to -- prior and
3    while on his 10 month jaunt, we have determined that he cashed
4    checks between 2017 and February 2020 totally $1.9 million.
5    That cash was immediately pulled out of that account.
6            All of them, of course, the proceeds come to the
7    scheme.  Because that was cashed, almost $2 million worth of
8    it, we couldn't trace it.  We don't know where it is.  We
9    don't if it is hoarded somewhere.  We just don't know.
10   Potential access to that amount of money or even a fraction of
11   that money should be great concern to the Court.
12           In addition, Your Honor, his personal
13   characteristics and mental condition --- factors strongly
14   suggest that detention is warranted.  We had properties of his
15   emailed and they show overwhelmingly that he was a very
16   manipulative person and a charlatan.
17           He falsely claimed special skills that allow him to
18   see ghosts, apparitions, demons, and spirits.  He has numerous
19   videos that are currently posted on YouTube where he is
20   claiming that he is able to film ghosts and demons on his body
21   and in his house.  I have provided Your Honor -- I hope you
22   are allowed those exhibits.
23        (Pause.)
24           MR. CLARKE:  Exhibit 1 reflects -- it is a
25   screenshot of that video of him filming supposed to be a

1   ghost.  Exhibit No. 2 is a screenshot of supposedly a demon

2   that he is filming where his head.  And these videos are quite

3   long in length.

4         Exhibit No. 3 is another shot of that same video,

5   and on the right hand side it lists all of the other videos

6   that he has posted on YouTube.  I think about 13 of them are

7   available for view, and about eight of them can't be viewed.

8         All those videos are doctored to make it appear that

9   the shadows and reflections on his head and face appear to be

10  apparitions of some sort.

11        And further, it appears that he uses these videos to

12  solicit people to participate in what I will refer to as

13  exorcism, to get the demons off of him or out of his house.

14        We don't know the exact purpose of these

15  solicitations, possibly to get money, possibly to get hits on

16  his videos.  We are not sure.  Your Honor, we note that on

17  Exhibit No. 2, there is a quote in the Comments section where

18  he talks about the video.

19        And about two-thirds down, he notes, and I am

20  quoting, "We need the help of someone that is familiar with

21  demonic activity.  Please contact me if you feel you can

22  assist in expelling these spirits from our home and our body."

23        So, that sentence there, "There is no trick

24  photography here, and I will be happy to do a live video feed

25  if it.  Or you can come and view it."  Come to his house and

1   view it for yourself.

2           It goes without saying that this is very odd and
3   deceitful behavior, and is displayed on the most public of
4   platforms to the public.

5           By showcasing his purported paranormal activity and
6   his paranormal skills, it appears that he is attempting to con
7   and manipulate people for his own self --- or possibly
8   financial gain.

9           We can't know, Your Honor, but he is eager to have
10  come to his house and accept what he is trying to say to them.

11          Based on that comment, as well as something else I
12  am going to talk about, Your Honor, it is clear that this is
13  not an innocent hobby or some kind of prank that he is trying
14  to get attention with.

15          He provides Your Honor with an example, Exhibit No.
16  4 and Exhibit No. 5.  It is two emails.  Those emails reflect
17  when he was confronted about an attempt to have an affair with
18  his sister in law, named Nicole, who was his brothers Rob's
19  wife.  He tried to defend himself in an email sent to the
20  extended family.

21          In it, he declared that he had a conversation with
22  his deceased nephew, Nicolas, and that Nicolas was giving
23  basically intelligence about Nicole's improprieties in the
24  marriage to Rob, and that this was the basis for Mr. Dinoto to
25  approach Nicole when he tried to solicit sex from her.

1    He also claimed in those emails, Your Honor, that he
2  got a message from his father. And he said he got that
3  message on the day of his father's funeral. And he told his
4  family members about that on the day of his dad's funeral.
5    All of this to manipulate the family into believing
6  that he was basically compelled by his own paranormal
7  activity, and that all of that is very truthful.
8    On page 4 of Exhibit 4, there is yellow highlighted
9  section and in there it confirms what I just Your Honor, that
10 his father was speaking to him from beyond the grave, and that
11 his nephew was also speaking to him and transmitting
12 information about his mother's infidelities.
13   On page 3, going backwards on that email, again, he
14 shows --- is just an innocent hobby. He quotes, swears on his
15 kids' lives, that it is 100 percent true, end quote.
16   Exhibit 5, that Your Honor has, about a month
17 earlier -- this was not a one-time thing. A lot of these
18 emails were posted in 2017, 2018. In this second email,
19 Exhibit No. 5, again he says, about half way on page 2, and I
20 am quoting, "I swear on everything I hold dear, my kids,
21 everything, that the paranormal activity is true."
22   Your Honor, he also lied to law enforcement. As I
23 mentioned earlier, he did a Mirandized statement. In addition
24 to admitting to the bare minimal, that he received the money,
25 he tried to justify it at the --- Commission. We will be

1  using those false, exculpatory statements against him at
2  trial.
3       But one of the most important factors that the Court
4  should consider is that there is evidence that Mr. Dinoto also
5  lied to this Court, and the Government has concerns about the
6  way the Defendant has gone about recruiting third party
7  custodians.
8       First, the Pretrial Services Report --- with the
9  Defendant in a desperate attempt to try and get family members
10 to be his third party custodian.  Family members who are
11 certainly not appropriate for that position, and they
12 certainly call into question the judgement and his intent to
13 abide by the Court's instructions.
14      First, he tried to get his wife, Tina Dinoto, to be
15 his custodian.  She refused.  She wouldn't sign the financial
16 bond.  And she had concerns -- after talking to the FBI
17 recently, she got concerned about her safety.
18      When his wife didn't work out as the custodian in
19 Florida, he offered his oldest daughter, Christina Dinoto,
20 knowing full well that she was just finishing up her own
21 probation a year ago, after serving a 19 month prison term,
22 and that she has a very bad drug habit, and we have evidence
23 that he used some of the proceeds from the scheme to try and
24 assist her when she ran into trouble with that drug habit.
25      When that second daughter wasn't going to work out

1          Other than third party custodians, Your Honor, you
2    can order location monitoring, which addresses any flight risk
3    concerns.  You can order no contact orders.  You can order GPS
4    monitoring.
5          You can order financial conditions so he is not
6    opening new lines of credit.  You can issue a restraining
7    order to address any financial concerns.  You can order a
8    mental health treatment.  You can order a drug treatment.
9          Your Honor, any differences between the co-Defendant
10   Elliott Kleinman and Mr. Dinoto are addressable strict
11   conditions.  If the Court wishes to, the proposed third party
12   custodians can join via Zoom as I mentioned before.
13         Your Honor, this is not a case that is so
14   extraordinarily different that he needs to be detained.  If
15   the Court has any questions, I am happy to answer them.
16         THE COURT:  No, I am fine.  Thank you, Ms. Banan.
17   Mr. Clarke, any response?
18         MR. CLARKE:  Very briefly, Your Honor.  I won't even
19   address the fact that counsel believes that this is a simple
20   paper chase.  I think a team of IRS and FBI agents have a
21   different point of view.
22         It is indeed complex and it should not be
23   trivialized as a mere paper chase.  It took quite a long time
24   to uncover all the aspects of the scheme.
25         I need to clarify this notion that because Mr.

 1  Kleinman is a co-defendant and he has been released, that Your
 2  Honor should consider releasing Mr. Dinoto.  Mr. Kleinman
 3  started this scheme way back when, prior to 2010, and it was
 4  nowhere near what we had charged.  He was getting small
 5  amounts of money from drivers bringing the drums to the plant.
 6            When Mr. Dinoto, the evidence will show, became the
 7  facilities manager, Mr. Kleinman retired.  Your Honor, that
 8  was in 2012.  Mr. Dinoto then took this scheme, decided to
 9  give Mr. Kleinman a 25 percent --- cut.
10            And Mr. Kleinman went on to live his life and he
11  would even get 25 percent of all future kickbacks, and it just
12  showed up in his account.
13            Mr. Dinoto was the leader, organizer, and manager of
14  the scheme for the nine years since Mr. Kleinman retired.  It
15  has been all about Mr. Dinoto.  So there is no comparison.
16            In addition, Mr. Kleinman hasn't lied to all the
17  people I have advised the Court about, from engaging in the
18  conduct the Court now knows about, there is just no comparison
19  whatsoever.  We have clearly overcome the presumption of
20  release as to Mr. Dinoto.
21            Then Your Honor, on the YouTube point, that was a
22  harmless video and people who are entitled to believe in
23  paranormal activity, I agree.
24            But in this case, it is not harmless because what we
25  have shown Your Honor is that this is a con.  In other words,

1  he doesn't believe what he is posting. He doesn't believe it

2  at all. He is filming it using his cell phone and he is

3  accepting -- he has been selling reflections off of KD screens

4  and saying it is in his own house, and calling it ghosts.

5  It is a con. And he is trying to get people call up

6  or come to his house. I don't know why, but why is he doing

7  it? It is a con, so it is very --- to Your Honor's

8  determination.

9  Finally, when the motion of the missing money, we

10 have had accountants, forensic accountants, and they could

11 only go so far. What Your Honor must know is that there is

12 $1.9 million that was pulled out in cash.

13 We can't see where it is spent. We can track

14 assets, to checks, to money transfers, and not find a thing

15 about the $1.9 million and we don't know where it went.

16 And it is not uncommon when people see the end of

17 the road that they are starting to clear out their accounts.

18 They splurge. They spend. They take the things are feasible.

19 They liquidated them and use them before we get them.

20 But they keep the cold hard cash somewhere else,

21 possibly with someone else. But we don't know. But that is

22 still a big concern.

23 That is all Your Honor. Thank you.

24 THE COURT: Mr. Clarke, let me just ask you just a

25 few follow up questions. You indicated that in January of