**Attachment A**

**The Defendant stipulates and agrees that if this case had proceeded to trial, the government would have proven the following facts beyond a reasonable doubt. The Defendant also stipulates and agrees that the following facts do not encompass all the evidence that would have been presented had this matter proceeded to trial.**

Defendant, Michael G. Verzaleno, Jr., was the vice president and part owner of Kearny Steel Container Corporation (hereinafter "KSC"), a business located at 401 South Street, Newark, New Jersey. Defendant Michael G. Verzaleno, Sr., was the president and part owner of KSC, and Defendant Susan P. Carrano was the controller of KSC. KSC was in the business of selling and transporting commercial drum containers, including new steel and fiber drums of varying sizes. Manufacturers used KSC's drums to store and transport products.

In or about 2013, two businessmen, Eugene DiNoto ("DiNoto") and John Criscuolo ("Criscuolo"), approached the Verzalenos about participating in a false billing scheme to defraud a large food manufacturing company called Citrus and Allied Essences (hereinafter "C&A"). DiNoto was an employee at C&A, and Criscuolo was a salesman for a drum vending company. Criscuolo knew the Verzalenos and had done business with KSC in the past.

C&A is a family-owned global business headquartered in New York that formulates and produces oils and extracts used in the food industry. C&A is affiliated with another company called Trilogy Essential Ingredients (hereinafter "TEI"), which produces flavoring ingredients and seasonings for the food industry. C&A has a manufacturing facility in Belcamp, Maryland, and TEI has a manufacturing facility in Abingdon, Maryland (hereinafter collectively referred to as "C&A"). Both facilities are in Harford County, Maryland. C&A uses metal and plastic drums to package and ship their flavors and oils. C&A buys their drums from vendors located in various states.

After learning of the details of the false billing scheme, the Defendants agreed to partner with DiNoto and Criscuolo to defraud C&A and share the proceeds. The scheme involved the submission of false KSC invoices to C&A for undelivered drums. As the manager of the Harford County manufacturing facility, DiNoto's primary responsibility was to choose which companies C&A purchased drums from and how many. In addition, DiNoto had authority to review drum invoices and authorize payments to drum vendors who supplied C&A. Consequently, DiNoto was well positioned to help the Defendants execute the scheme to defraud C&A.

1

During the initial period of the 7-year scheme, Criscuolo would contact the Defendants on behalf of DiNoto to place an order with KSC for a shipment of drums. In or about 2014, DiNoto began placing drum orders directly with the Defendants instead of using Criscuolo as the go-between. When a real drum order was placed, a truckload of drums was dispatched to C&A from KSC's warehouse in Newark, NJ. When Criscuolo and DiNoto sent the Defendants a fictitious drum order, there was no drum delivery but KSC billed C&A nonetheless. The Defendants invoiced C&A for both the real and the false orders within days of getting them from Criscuolo and DiNoto. The invoices were emailed from KSC's email account in New Jersey to DiNoto's email account at C&A in Maryland.

KSC's usual bookkeeping process for invoicing C&A for real drum orders required KSC's truck drivers to get C&A's warehouseman to acknowledge receipt of the drum by signing a delivery ticket that set forth the quantity and type of drums delivered. Upon the truck driver's return to KSC, the driver gave KSC's dispatcher the signed delivery ticket as proof that the drums were successfully delivered. The dispatcher, in turn, gave the signed delivery ticket to KSC's business office that same day or the next. There, the drum prices were handwritten on the delivery receipt by one of the Defendants and then given to the billing clerk to type up an invoice to send to C&A.

A different bookkeeping process was used to invoice C&A for the false drum orders. Since the dispatcher never received the false drum orders, no delivery tickets were generated for a KSC truck driver to present to C&A. Instead, the Defendants used a blank delivery receipt to write down a false drum order. The Defendants handwrote the drum prices on the false delivery receipt and gave it to a billing clerk with directions to invoice C&A as if the delivery receipt had come from the dispatcher for an actual drum delivery. The false invoices were intermittently sent to C&A with real invoices. In this way, the billing clerks created and saved both the real and false invoices using the same QuickBooks accounting software. However, the Defendants used handwritten ledgers to separately track the false invoices.

Despite C&A never getting any of the drums listed on KSC's false invoices, DiNoto approved them for payment, and then had the invoices sent via email from Maryland to C&A's accounts payable department in New York. There, based on DiNoto's authorization, checks were made payable to KSC for the full amount of the false invoices and mailed to KSC's principal office

in New Jersey.  C&A's checks were deposited into KSC's business bank account.  Between approximately September 2013 and January 2020, C&A's payment of false KSC invoices totaled $3.5 million.

In return for their role in the false billing scheme, the Defendants paid DiNoto and Criscuolo cash kickbacks for facilitating the false invoice payments.  The amount of the cash kickback depended on the amount of the false invoice.  The totals on the invoices ranged on average between approximately $15,000 to $30,000 per invoice.  The Defendants kept the balance of each false invoice payment after paying the kickbacks.

The Defendants usually paid DiNoto his cash kickbacks via FedEx packages sent to his personal residence located in Harford County, Maryland.  Sometimes they paid DiNoto in person when he met with the Verzalenos in New Jersey, or they gave DiNoto's share to Criscuolo and he would hand deliver it to DiNoto.  The Defendants always paid Criscuolo his cash kickbacks in person, which he usually picked up in an envelope at KSC's business office.  According to FedEx records available from 2015, the Defendants sent 105 FedEx packages with cash kickbacks to DiNoto's Maryland residence over the last four years of the 7-year scheme.

Each Defendant had a role in executing the scheme.  Michael Verzaleno, Jr. ("MV, Jr."), was the primary contact with DiNoto.  As such, he coordinated the timing of the submission of real and false drum invoices to C&A.  MV, Jr., with Defendant Carrano's assistance, was also primarily responsible for coordinating the kickback payments to DiNoto and Criscuolo, including providing the cash to be FedExed to DiNoto and hand delivered to Criscuolo. On September 15, 2021, the day law enforcement agents executed a search warrant at KSC, MV, Jr., was asked about his relationship with DiNoto and he admitted giving DiNoto about $5,000 to $10,000 in cash per month as part of their business dealings.  He also confirmed that the cash kickbacks were part of a "pay for play" arrangement.

MV, Jr., also approved advance kickback payments when DiNoto wanted his money before he submitted a false invoice.  For example, on November 20, 2017, DiNoto asked MV, Jr., "Would it be possible to get the FedEx out today or tomorrow so it delivers Tuesday or Wednesday, before the [Thanksgiving] holiday?  I will be traveling the next two weeks."  MV, Jr., responded, "Absolutely.  I was gonna send it today."

Sometimes MV, Jr., and DiNoto used coded language in their email exchanges to confirm the size and timing of those advance payments. For example, on August 11, 2016, MV, Jr., advised DiNoto that "Sue [Carrano] will send you the [FedEx] tracking number for the 10 capseals [$10,000] you need." Carrano was copied on the same email and asked by MV, Jr., to send DiNoto the FedEx tracking number for the package. In another email on February 23, 2017, DiNoto emailed MV, Jr., asking, "Can you please send out next week's 20 containers [$20,000] today? I am heading to California again." Other coded phrases in other email exchanges that referenced advance cash kickbacks included "20 bung caps" and "20 cap seals plus the 10 extra . . . that's 30 in total."

MV, Sr., was the primary contact with Criscuolo during the initial years of the scheme. Throughout the 7-year scheme, MV, Sr., worked closely with Carrano in KSC's administrative office facilitating the false invoicing process. They both would write the false drum orders on the blank delivery receipts that would be given to the billing clerks. MV, Sr., usually handwrote the drum prices on the false delivery receipts (as he would do with a real one), but sometimes Carrano would do it. Both would give the completed false delivery receipts to a billing clerk to type up the false invoices to be sent to C&A (as they would do with a real one). Carrano made sure the FedEx packages were sent to DiNoto and that Criscuolo's cash was ready for pick up at KSC's business office. Criscuolo was given his cash kickback in an envelope by either MV, Sr., or Carrano, or in folded bills from MV, Jr.

On September 29, 2022, Carrano was interviewed in the presence of her counsel at the United States Attorney's Office in Baltimore, Maryland. During the interview, Carrano identified her handwriting on a QuickBooks open balance sheet for C&A's customer account, including the written notation "Gene paid" next to certain invoice numbers. When asked whether she knew what was paid to Eugene DiNoto ("Gene"), she falsely stated she did not know despite the fact that she was one of the people who gave $10,000 in cash to a KSC billing clerk to send via FedEx to DiNoto's residence. When asked whether she and other employees at KSC used FedEx services, she falsely stated that she and others only used the service to send gifts to customers, like baseball tickets. And when asked why KSC had the address of DiNoto's personal residence in Maryland, she falsely stated that she did not know.

      I have read this Statement of Facts and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. I do not wish to change any part of it.

_11/14/2024_  
Date

_Michael Verzaleno_  
Michael G. Verzaleno, Jr.

      I am Mr. Verzaleno's attorney. I have carefully reviewed every part of this Statement of Facts with him. To my knowledge, his decision to sign it is an informed and voluntary one.

_11/14/2024_  
Date

_Lee Vartan_  
Lee Vartan, Esq.