

*faegredrinker.com*

**Peter W. Baldwin**
peter.baldwin@faegredrinker.com
+1 212 248 3147 direct

**Faegre Drinker Biddle & Reath** LLP
1177 Avenue of the Americas, 41st Floor
New York, New York  10036
+1 212 248 3140 main
+1 212 248 3141 fax

February 13, 2025

**<u>VIA THE U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF MARYLAND</u>**

The Honorable Paula Xinis
United States District Judge
United States District Court
District of Maryland
6500 Cherrywood Lane
Suite 255
Greenbelt, MD 20770

Re:   *United States v. Verzaleno et al.*, Case No. 23-CR-323

Dear Judge Xinis:

      This letter is submitted to Your Honor in anticipation of the sentencing hearings for the three defendants in the above-captioned matter, all of which are scheduled for February 19, 2025. This law firm represents Citrus and Allied Essences, Ltd. ("C&A" or the "Company"), the victim of the multi-year, multi-million-dollar fraud perpetrated by the defendants in this case – Michael G. Verzaleno, Sr., Michael G. Verzaleno Jr., and Susan P. Carrano – and others, including former C&A employee, Eugene DiNoto, and another drum salesman, John Criscuolo, both of whom were charged in separate cases.[1] While many the facts of the defendants' criminal conduct are largely undisputed, C&A and the individual family members who are the owners of C&A, wish to submit this letter to provide additional context for the defendants' crimes.

      Through the submission of this letter, C&A hopes that the Court will appreciate the truly overwhelming impact that the defendants' fraud has wrought on the Company and its employees. As the defendants admitted at the time of their guilty pleas in this case, during a seven-year period between 2013 and 2020, the defendants used their company, Kearny Steel Container Corporation ("Kearny"), to perpetrate a multi-million-dollar fraud and falsely invoice C&A for millions of dollars of materials that the defendants knew were never actually delivered to C&A. The defendants were able to accomplish this fraud by partnering with and paying kickbacks to rogue C&A employee, Eugene DiNoto, and another vendor, John Criscuolo.

      The scope of this fraud – both with respect to how long it lasted and its financial effect – almost defies belief. Indeed, C&A has spent years attempting to recover from the fraud. Due to the Company's depleted profits as a result of the fraud, C&A was unable to grow its business. Specifically, for many years, the Company's relative profitability – which was directly impacted by the defendants' role in the fraudulent scheme – made it unfeasible to hire additional employees. The fraud also directly impacted the Company's credit, which in turn, caused C&A to pay higher prices to other vendors, which, as a result, further depleted the Company's profit margins. It is by

---

[1]   *See United States v. Eugene DiNoto and Elliot Kleinman*, Case No. 21-CR-342-LKG and *United States v. John Criscuolo*, Case No. 23-CR-141-DKC.

The Honorable Paula Xinis - 2 - February 13, 2025

no means an exaggeration to say that C&A is, to this day, suffering the financial effects of the defendants' fraud and is attempting to put itself on a solid financial footing.

Perhaps more importantly, while the defendants might have believed they were defrauding some faceless corporation, it was actually C&A's employees who they were stealing from. During the relevant time period, C&A had approximately 125 employees. Many of these employees had dependents – husbands, wives, and children. All of these people were affected by the defendants' fraud. The millions lost due to the fraud affected the Company's ability to offer benefits to its employees and their beneficiaries. It affected the health care and other insurance benefits that C&A was able to offer, and it affected the Company's ability to provide matching funds for its employees' 401k retirement plans. While C&A may be able to recover from the defendants' fraud, many of the individual employees and their families never will.

C&A understands that, at the time of their guilty pleas, the defendants made a restitution payment of $3.5 million. The Company further understands that this payment is being held by the Clerk of the Court. While C&A knows that it is customary for restitution payments not to be released to victim until all related defendants are sentenced, C&A respectfully requests that the Court order the Clerk to immediately release to C&A the restitution that has been received, as well as any restitution payments made by the defendants at the time of their sentencing. While C&A expects that additional restitution payments may be made in the future by these and other defendants, receiving funds that have already been paid would greatly help C&A to continue to recover financially from the defendants' fraud. Even this relatively small gesture would go a long way to start making the Company and its employees whole.

## BACKGROUND INFORMATION

C&A is a wholly owned subsidiary of C&A Holdings International, Ltd., a privately held, family-owned corporation engaged through C&A in the import and manufacture of essential oils and extracts used in the food, flavor, and fragrance industries. C&A is headquartered in Maryland, and the Company has a manufacturing facility in Belcamp, Maryland.[2]

C&A was founded in 1933 by Charles Pisano. Since that time, members of the Pisano family have continued to own and operate C&A. C&A's current Chief Executive Officer is Richard Pisano, Jr., and various other Pisano family members continue to have management and board roles at the Company. Four generations of the Pisano family have worked at the Company.

One of the defendants' partners in this scheme, Eugene DiNoto, worked for C&A for approximately 25 years. From approximately 2012 until his termination in January 2020, DiNoto held the position of Facilities Manager at C&A's Belcamp, Maryland facility. In his capacity as Facilities Manager, DiNoto was responsible for, among other things, ordering packaging drums and containers of various sizes and types in which C&A's products were packaged and shipped to customers. C&A's production and management personnel would request that DiNoto purchase certain types and quantities of containers as needed to fulfill customer orders. DiNoto then proceeded to place orders with several drum and container vendors, including, among others, Kearny and its affiliated company, National Packaging Services, Inc. ("NPS"), both of which were owned and controlled by defendants Michael G. Verzaleno, Sr. and Michael G. Verzaleno, Jr. during the relevant time period.

---

[2] A separate corporation owned by members of the same family, Trilogy Essential Ingredients, Inc. ("TEI"), manufactures ingredients, seasonings, and compounded flavors at a facility in Abingdon, Maryland.

The Honorable Paula Xinis - 3 - February 13, 2025

DiNoto was also responsible for approving payment of drum and container vendor invoices by C&A's accounting department. Following the receipt of an invoice from a drum or container vendor, DiNoto would approve the invoice and forward it to C&A's accounting department for payment. Packaging drums and containers constitute one of the largest annual business expenditures for C&A. In January 2020, C&A began to conduct a detailed review and analysis of the Company's drum and container purchase and procurement process in order to determine whether the Company could achieve any cost savings and increase profitability. The initial review of C&A's packaging purchase records revealed possible abnormalities associated with the purchase of drums and containers used in the storage and shipment of C&A's products. Specifically, the review suggested that C&A was paying for more drums and containers than it was actually using.

Upon the initial discovery of evidence suggesting excess purchases of drums and containers, C&A retained Faegre Drinker Biddle & Reath LLP ("Faegre Drinker") and FTI Consulting ("FTI") to investigate (1) whether and to what extent C&A was paying more for drums and containers than it was actually using, and (2) whether any excess purchases were the result of a criminal scheme perpetrated by C&A employees and/or third-party vendors. Faegre Drinker's and FTI's investigation revealed that the quantity of drums and containers purchased by C&A from certain third-party vendors was far greater than the quantity of drums and containers used in production and shipped to customers. In addition, the investigation revealed that all or substantially all of these excess purchases were the result of an embezzlement scheme led by DiNoto and involving multiple third-party drum and packing vendors, including Kearny.

With respect to Kearny, Faegre Drinker and FTI concluded that the defendants conspired with DiNoto to submit fraudulent invoices totaling approximately $5.6 million. Specifically, the investigation revealed that, between 2017 and 2019, C&A purchased over 279,000 containers from Kearny for a total of $6,526,942. However, only a small percentage of these purchases were substantiated by invoices or other sales or delivery documentation. Faegre Drinker and FTI ultimately concluded that less than 10 percent – or approximately $890,000 – of the purchases by C&A from Kearny appeared to be legitimate. The remainder of the purchases – or approximately $5.6 million – had no documentary support and, thus, were determined to be fraudulent.

Upon the discovery of the multi-million-dollar fraud perpetrated against C&A, the matter was referred to the Federal Bureau of Investigation ("FBI") and the U.S. Attorney's Office for the District of Maryland. The government's investigation has, to date, resulted in guilty pleas by at least seven individuals, including two former C&A employees – DiNoto and Elliot Kleinman[3] – and individuals affiliated with various third-party drum and packaging vendors, including the three defendants in this case.

**THE DEFENDANTS' FRAUDULENT CONDUCT**

In connection with their guilty pleas in this case, the defendants stipulated to certain facts concerning their efforts to defraud C&A. Among other things, the defendants admitted the following:

- Verzaleno, Sr. and Verzaleno, Jr. were the president and the vice president of Kearny, respectively. Both defendants were also part owners of Kearny. Carrano was Kearny's controller.

---

[3] *See United States v. Eugene DiNoto and Elliot Kleinman*, Case No. 21-CR-342-LKG.

The Honorable Paula Xinis	- 4 -	February 13, 2025

- In approximately 2013, the defendants, DiNoto, and Criscuolo agreed to execute a billing scheme to defraud C&A. This fraudulent scheme involved the submission of false invoices for undelivered drums.

- As part of the scheme, DiNoto or Criscuolo would contact the defendants to place drum orders with Kearny. Some of these orders were legitimate and some were fictitious, where no drums were delivered, but Kearny would invoice C&A for undelivered drums regardless.

- The defendants created false invoices by using blank delivery receipts and handwriting drum prices. Verzaleno, Sr. and Carrano worked closely to facilitate the false invoicing process by handwriting the false drum orders on blank delivery receipts.

- The defendants would instruct a billing clerk to type up the false invoices for undelivered drums before sending them to C&A for payment. Verzaleno, Jr., as the primary contact with DiNoto, would coordinate the timing of the submission of false invoices to C&A.

- DiNoto would approve the false invoices for payment and authorize checks made payable to Kearny. The checks were then mailed to Kearny and deposited into Kearny's business bank account.

- The defendants paid DiNoto and Criscuolo cash kickbacks – sometimes in advance – for facilitating the billing scheme. Verzaleno, Jr., with Carrano's assistance, was primarily responsible for coordinating the kickback payments. These cash payments were made either by hand delivery or by FedEx. Sometimes, Verzaleno Jr. and DiNoto sent emails using coded language to refer to the size and timing of the kickbacks.

- Between September 2013 and January 2020, the defendants falsely invoiced C&A a total of $3.5 million. After coordinating and paying the kickbacks mentioned above, the defendants kept the remainder of the fraudulent proceeds.

- On September 29, 2022, Carrano was interviewed at the U.S. Attorney's Office and made three false statements regarding her knowledge of and Kearny's involvement in paying certain kickbacks to DiNoto.

## **C&A'S POSITION ON AN APPROPRIATE SENTENCE**

### I. **Restitution and Forfeiture**

Prior to the defendants' guilty pleas in this case, the parties entered into plea agreements. As part of their agreements, the defendants agreed to the entry of a Restitution Order in the amount of $3.5 million. At the time of their guilty pleas, the defendants paid $3.5 million in restitution, which C&A understands is being held by the Court Clerk subject to further orders of the Court. Verzaleno, Sr. and Verzaleno, Jr. also agreed to the entry of an Order of Forfeiture in the amount of $1 million.

C&A concurs with the parties' agreement as to the entry of an Order of Forfeiture. However, C&A disagrees with the parties' conclusion that C&A is entitled to only $3.5 million in restitution. As noted above, C&A's investigation revealed that the defendants' false billing scheme resulted in losses to C&A totaling approximately $5.6 million for drums that were never delivered. While C&A is grateful to the government for its efforts in investigating and resolving this case,

The Honorable Paula Xinis - 5 - February 13, 2025

C&A respectfully disagrees with the parties' conclusion regarding the losses to the Company and requests that the Court issue a Restitution Order directing payment of $5,636,450 to C&A.

In addition, C&A understands that the defendants are arguing that any restitution in this case should be reduced by the amount of the payment that C&A received from its insurer in connection with a claim made concerning the fraudulent scheme outlined above. C&A did make a claim with its insurer regarding the scheme perpetrated by the defendants, DiNoto, and many others, and the Company recovered $1 million in connection with that claim – the limit of the policy in question. However, the insurance proceeds were intended to provide payment in connection with the entirety of fraud perpetrated against the Company, including the frauds perpetrated by other container vendors, including Anthony Urcioli[4] and Robert DiNoto,[5] and not simply the fraud perpetrated by the defendants in this case. The Fourth Circuit has held that the victim's receipt of insurance proceeds does not reduce a defendant's restitution obligation. *Walsh v. United States*, No. CRIM. RWT-05-001, 2014 WL 583072, at *7 (D. Md. Feb. 12, 2014) (explaining that while restitution provisions ensure that victims do not receive amount exceeding losses, they do not permit defendants to pay less in restitution and would instead allow a court to amend the order to direct certain payments to insurer). At best, any offset to the defendants' restitution obligation should only be for a pro rata share of the total loss resulting from *all* of the related frauds. But the Court has no obligation to reduce the restitution order at all.

## II.  Custodial Sentence

### Michael G. Verzaleno, Sr.

With respect to a custodial sentence, as part of the defendant's plea agreements, the parties agreed that, under the United States Sentencing Guidelines (the "Guidelines"), Verzaleno, Sr.'s base offense level is 7, and there is a 16-level upward adjustment because the loss in this case is more than $1.5 million, but less than $3.5 million. However, the parties stipulated that, because the defendant was a "minor participant" in the criminal activity, a two-level downward adjustment is warranted. The parties agreed that an additional two-level downward adjustment may be warranted if the defendant does not receive any criminal history points from Chapter 4, Part A of the Guidelines. In addition, the government stated it "does not oppose" a two-level reduction in the defendant's adjusted offense level "based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct" and agreed to make a motion pursuant to § 3E1.1(b) of the Guidelines for "an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty." The parties also agreed that "a two-level downward variance is warranted to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." Finally, the parties agreed and stipulated that a two-level downward variance is warranted because of the defendant's age and physical health.

### Michael G. Verzaleno, Jr.

Pursuant to the Verzaleno, Jr.'s plea agreement, the parties agreed and stipulated that, under the Guidelines, defendant's base offense level is 7, and there is a 16-level upward adjustment because the loss in this case is more than $1.5 million, but less than $3.5 million. The government stated it "does not oppose" a two-level reduction in the defendant's adjusted offense level "based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct" and agreed to make a motion pursuant to §

---

[4]  *See United States v. Anthony Urcioli, Sr.*, Case No. 22-CR-29-LKG.
[5]  *See United States v. Robert DiNoto*, Case No. 22-CR-287-LKG.

The Honorable Paula Xinis — - 6 - — February 13, 2025

3E1.1(b) of the Guidelines for "an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty." In addition, the parties agreed and stipulated that "a two-level downward variance is warranted to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."

**Susan P. Carrano**

Pursuant to Carrano's plea agreement, the parties agreed and stipulated that as for Count One, under the Guidelines, defendant's base offense level is 7, and there is a 16-level upward adjustment because the loss in this case is more than $1.5 million, but less than $3.5 million. The parties stipulated that, because the defendant was a "minimal participant" in the criminal activity, a four-level downward adjustment is warranted. The parties agreed that an additional two-level downward adjustment may be warranted if the defendant does not receive any criminal history points from Chapter 4, Part A of the Guidelines. In addition, the government stated it "does not oppose" a two-level reduction in the defendant's adjusted offense level "based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for [her] criminal conduct" and agreed to make a motion pursuant to § 3E1.1(b) of the Guidelines for "an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty." The parties also agreed that "a two-level downward variance is warranted to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." Finally, the parties agreed and stipulated that a two-level downward variance is warranted because of the defendant's age and physical health.

\* \* \* \* \*

C&A objects to the following matters relating to the defendants' Guidelines calculations:

- First, C&A objects to the 16-level loss adjustment, because, as noted above, C&A believes that the loss in this case is more than $3,500,000. As noted previously, C&A's investigation revealed that Kearny stole approximately $5.6 million as a result of the defendants' fraudulent billing scheme. Thus, an 18-level loss adjustment is warranted.

- Second, C&A objects to Verzaleno Sr. receiving a two-level downward adjustment for being a "minor participant" in the criminal activity and Carrano receiving a four-level downward adjustment for being a "minimal participant" in the criminal activity. While the conduct of Verzaleno Sr. and Carrano is not as egregious as that of others involved in the related fraudulent schemes, the defendants were active and willing participants in the criminal conduct. As Verzaleno Sr. admitted, he would handwrite false delivery receipts to be sent to C&A as false invoices. And Carrano not only assisted in writing false drum orders but was instrumental in ensuring DiNoto and Criscuolo received their kickback payments. As Carrano admitted, she made sure FedEx packages containing the kickbacks were sent to DiNoto and that cash was available for Criscuolo to pick-up in person at Kearny's business office. The actions of Verzaleno Sr. and Carrano are not actions of a "minor participant" and a "minimal participant," respectively.

Pursuant to 18 U.S.C. § 3553(a), the Court "shall impose a sentence sufficient, but not greater than necessary." In addition to the applicable advisory Sentencing Guidelines range, Section 3553(a) requires the Court, in determining the particular sentence to be imposed, to consider several factors, including, among others, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to deter future criminal conduct and protect the public from the defendant. All of these factors support the

The Honorable Paula Xinis - 7 - February 13, 2025

imposition of custodial sentences, in addition to the restitution and forfeiture obligations the defendants have already agreed to, as discussed above.

First, with respect to the nature and circumstances of the offense, and as explained above, each of the defendants' conduct was undoubtedly serious. The defendants' actions were brazen and took place over a period of multiple years. As the defendants have admitted, they directly assisted and participated in a scheme to defraud C&A. They lied repeatedly and, despite seemingly being financially well off, they personally profited from their fraud. Thus, the only motivation here was personal greed. While it is a credit to the defendants that they agreed to plead guilty in this case, there is little evidence that the defendants have any remorse for the damages they caused to C&A, its owners, and its employees.

As noted previously, the financial impact of the defendants' fraud on C&A has been enormous. The actions of the defendants and other fraudulent actors resulted in millions of dollars in losses to C&A – a shocking amount for a medium-sized, family-run business. These losses have impeded C&A's efforts to grow and hire new employees, particularly in Maryland and other parts of the United States. In addition, beyond the dollar losses, the defendants' fraud has taken an emotional toll on C&A's owners and employees, as they have had to come to terms with the fact that long-standing employees and a long-standing vendor were working together to steal millions from the Company and its employees. Finally, the defendants' actions have directly impacted C&A's employees and their families, most notably through their impact on the benefits that C&A is able to offer its employees. In this regard, the defendants' actions have directly and negatively impacted the lives of over 500 people.

Second, with respect to the history and characteristics of the defendants, C&A is not aware of any other criminal conduct by the defendants. However, it is worth repeating that these are financially well-off individuals who stole money from a family-owned business for personal gain over the course of many years.

Third, a non-custodial sentence will not further the goals of specific or general deterrence. It would show the defendants that there are limited consequences for their callous and fraudulent conduct. And it would serve as a powerful message to other would-be fraudsters that crimes like this will not result in significant or serious repercussions.

The Honorable Paula Xinis - 8 - February 13, 2025

    Given the foregoing, C&A respectfully submits that custodial sentences, along with the entry of a restitution order in the amount of $5,636,450 and an Order of Forfeiture, is sufficient, but not greater than necessary to satisfy the purposes of sentencing as set forth in Section 3553(a). The requested sentence will properly reflect the seriousness of the offense conduct in this case.

    We thank Your Honor for your attention to this matter.

Respectfully submitted,

FAEGRE DRINKER BIDDLE & REATH LLP

*/S/ Peter W. Baldwin*

Peter W. Baldwin


cc:    Meaghan Geatens, Esq.
       Sophia Gardell, Esq.